**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Mark PHELPS, Defendant–Appellant.**

**No. 88–5294.**

United States Court of Appeals, Ninth Circuit.

Feb. 13, 1990.

---

Before WRIGHT, FARRIS and NELSON, Circuit Judges.

## ORDER

En banc review of the court's opinion herein was requested by an active circuit judge. A majority of the active judges have voted to deny the request. En banc review is denied.

KOZINSKI, Circuit Judge, and four other Circuit Judges dissent from this order.

KOZINSKI, Circuit Judge, with whom Circuit Judges NORRIS, BRUNETTI, THOMPSON and O'SCANNLAIN concur, dissenting from the order rejecting the suggestion for rehearing en banc.

By failing to take this case en banc, the court "lets stand an unfortunate and utterly needless hindrance to effective law enforcement." *United States v. Cunningham*, 890 F.2d 199, 200 (9th Cir.1989) (O'Scannlain, J., dissenting from the order rejecting the suggestion for rehearing en banc). In reversing defendant's conviction for violating 18 U.S.C. § 924(c)(1), the panel's opinion reads into the statute a scienter requirement that Congress refused to put there, a requirement that has been rejected by every other federal court of appeals that has addressed the issue. Equally troubling, the panel reverses a conviction for conduct that is squarely covered by the relevant statute, raising serious doubt about whether Congress can *ever* write a law safe from judicial dismemberment.

## Facts

Mark Phelps was a man with a problem: He was in the business of manufacturing illegal drugs, but he just couldn't get his hands on a commercial quantity of Ephedrine, a restricted precursor of methamphetamine. RTI 16–17, 22. His partner, Raymond Turnipseed, eventually turned up a potential supply of Ephedrine, but the supplier wanted to satisfy himself that he wasn't dealing with amateurs. RTI 19–20, 39–40. Having learned that the supplier had a friend who was interested in guns, RTI 41–42, Phelps decided to impress them by displaying his expertise not merely with drugs, but with illegal weapons as well. Thus, just before Turnipseed gave the supplier and his friend a tour of the lab, Phelps showed them a MAC 10 machine pistol and did everything he could to impress them: He boasted about how he had converted it from semiautomatic to automatic, RTI 55; he broke it down and explained to them how it worked, RTI 56, 110–11; he showed them the silencer he had built for it, RTI 107, 113; and he brought out four or five loaded magazines, RTI 109, which he encouraged them to test-fire. RTI 52, 102–03.

Phelps's dog-and-pony show was a hit; the men were fascinated by the gun. But when they asked Phelps how much he wanted for it, he told them it wasn't for sale—unless they agreed to supply Ephedrine, in which case he would give them the machine gun and silencer for free. RTI 60–61, 114–16. The suppliers—in reality, undercover federal agents—agreed and set a date for the exchange.

With the benefit of perfect foresight, the federal agents no doubt would have tried to arrest Phelps and Turnipseed on the spot. A fellow law enforcement officer would pay dearly for the fact that Phelps still had the MAC 10 in his possession two and a half hours later.

## Discussion

The question presented here is simple: Did Phelps use the MAC 10 "in relation to" a drug trafficking crime? The panel concludes he did not; it couldn't be more wrong.

### 1. Plain Language

The relevant statute is 18 U.S.C. § 924(c)(1), which tacks on five years to the sentence of any person who uses a firearm "during and *in relation to* any crime of violence or drug trafficking crime" (emphasis added). The panel concludes that Phelps's conduct is not covered by section 924(c)(1). This conclusion is nothing short of astonishing, given the statute's excep-

tionally broad language and the direct and active part the gun played in the drug transaction.

The panel recognizes that "[t]he phrase 'in relation to' is broad." *United States v. Phelps*, 877 F.2d 28, 30 (9th Cir.1989). Having started down the right path, the panel immediately takes a wrong turn: "Because either party's interpretation of the statute is plausible, we look to its history and purpose to ascertain the correct reading." *Id.* But this is a non sequitur: A statute's breadth has no bearing on whether it is subject to multiple interpretations. A statute can be very precise while covering much territory; Congress is capable of painting with a wide brush, yet making its meaning perfectly clear.

In deciding whether it is appropriate to go beyond statutory language, the touchstone is not breadth but ambiguity: Are the conflicting interpretations proffered by the parties each plausible? Here the defendant's proffered interpretation certainly is not. It is difficult to think of a term broader than "in relation to"; I can envision no plausible interpretation of the phrase that would place Phelps beyond the reach of section 924(c). Phelps agreed to turn over the gun and a quantity of methamphetamine in exchange for the Ephedrine he so badly needed. Far more than the ordinary case where a gun is carried by one of the parties merely for protection, the gun here was an integral part of the transaction—it was the sweetener that made the deal work. Yet the panel concludes that it was not used "in relation to" the crime. Under the panel's reasoning, one could equally well conclude that the drugs themselves were not used "in relation to" the drug transaction.

The panel's refusal to apply the statute to a fact situation squarely covered by the clear statutory language, and the full court's failure to correct the error, raise a fundamental question: Is there any law that the courts cannot circumvent through creative "interpretation"? The answer apparently is no. If the phrase "during and in relation to any ... drug trafficking crime" can be construed as excluding the situation where a drug manufacturer brings an automatic weapon and ammunition to a place where a drug deal is going down, offers to load the gun and shoot it, and the gun serves as the bait that makes the deal click, it is difficult to imagine *any* statutory language that a court cannot construe out of existence, based simply on its own gut feeling that this is not what Congress had in mind.

Judges must apply the law as written, not as their instincts tell them Congress probably meant it. Language, when properly interpreted and literally applied, provides a meaningful constraint on judicial action; when we allow ourselves to be guided by intuition that Congress didn't really mean what it said, we are no longer interpreting laws, we are making them.

2. Legislative History

A. "Given the unambiguous nature of the statute, recourse to legislative history is unnecessary." *Saratoga Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.*, 879 F.2d 689, 693 (9th Cir.1989). *Accord Hallstrom v. Tillamook County*, — U.S. —, 110 S.Ct. 304, 308, 310, 107 L.Ed.2d 237 (1989); *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 108 S.Ct. 1255, 1258, 99 L.Ed.2d 460 (1988). But even if resort to legislative history were appropriate here, there is no justification for the manner in which the panel opinion uses it in this case.

The panel notes that the relevant legislative history is "sparse." 877 F.2d at 30. This is an understatement. Within a 425–page committee report, the only reference to the "in relation to" requirement is contained in a single sentence buried in a long footnote:

> Moreover, the requirement that the firearm's use or possession be 'in relation to' the crime would preclude its application in a situation where its presence *played no part in the crime*, such as a gun carried in a pocket and *never displayed or referred to* in the course of a pugilistic barroom fight.

S.Rep. No. 225, 98th Cong., 2d Sess. 314 n. 10, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3492 n. 10 (emphasis

added). I am at a loss to understand what support the panel draws from this lonely reference. The report in question pertains to the 1984 version of section 924(c), which does not even mention drug trafficking crimes; that language was added two years later. *See* pp. 1284–1285 *infra.* This pithy statement reveals only that Congress meant to exclude from the sweep of section 924(c) those rare cases where the gun plays absolutely no part in the criminal activity because it is completely concealed and its presence at the scene of the crime is accidental. This is the antithesis of the situation presented here: Phelps's converted MAC 10 was at the heart of this drug transaction and everyone involved was aware of its presence. More to the point, the risks generated by Phelps's possession of the gun were precisely those Congress meant to deter and punish when it passed section 924(c). *See* pp. 1284–1286 *infra.*

Ultimately, the panel's conclusion hinges on its "doubt that Congress considered the novel use of a firearm as an item of barter." 877 F.2d at 30. But Congress need not contemplate every factual permutation to which its statutes are likely to apply. It is enough if Congress sets out an intelligible and reasonably precise standard that covers the situation. Here, Congress used the broad term "in relation to" precisely to avoid interpretive hair-splitting about peculiar and unexpected factual scenarios that might escape a more narrowly drawn definition. *See* p. 1284 *infra.* Once we determine that the statutory language covers the situation, our task is at an end.

What the panel has done here is quite extraordinary. Having started with clear statutory language, it has nevertheless turned to the legislative history for help. But the legislative history turns out to be no help at all; it shows only that Congress did not single out this particular fact pattern for special consideration, directing its only comment to a non-analogous situation. The panel nevertheless manages to deduce from this wholly ungermane remark that Congress meant to exclude from the sweep of section 924(c) guns used as barter, a situation it said nothing at all about. But this is not reliance on legislative history as

I understand the term; it is clairvoyance. If we are free to make up the law based on our guess as to what Congress may have thought about a case it never thought of, we might as well dispense with statutes altogether and rely on ouija boards instead.

B. To the extent it has a legitimate role to play in helping courts construe statutory language, legislative history is most appropriately used to provide an understanding of the evil Congress sought to remedy, trace the evolution of the statutory language and identify the reasons advanced for particular word choices. Statutory interpretation is not supposed to be a scavenger hunt through committee reports and other legislative materials for a stray phrase or sentence that the court can use to justify its gut feeling about how the case should come out.

Yet that is precisely what the panel has done here. By focusing myopically on a single, largely irrelevant, sentence in a non-germane committee report, it has overlooked the most obvious expressions of legislative purpose. As noted, the panel refers to a 1984 committee report, but it was not until 1986 that section 924(c) was amended to expressly refer to drug trafficking offenses. The committee report that accompanied the 1986 amendment indicated that section 924(c) would serve as "an important new weapon against narcotics traffickers." H.R. No. 495, 99th Cong., 2d Sess. 2, *reprinted in* 1986 U.S.Code Cong. & Admin.News 1327, 1328. Significantly, the committee considered and rejected language that would have required proof as to the defendant's purpose for having the gun, characterizing this inquiry into "the defendant's state of mind" as "a substantial burden on the prosecution" and "unnecessary to prevent injustice." *Id.* at 1335.

Section 924(c)(1) was extended to drug dealers in 1986 for one overriding purpose: to reduce the danger to law enforcement officers and the public that comes from drug dealers who are armed, particularly those armed with automatic and assault-type weapons. *See id.* at 1333 (stressing "the need for more effective protection of law enforcement officers from the prolif-

eration of machine guns and high-powered 'assault-type' weapons that are increasingly being used by criminals"). Congress quite reasonably concluded that drug dealers who are armed pose a far greater danger than those who are not, and therefore heaped on additional punishment for carrying a weapon during the commission of a drug-related crime. The 1986 legislative record leaves no doubt that Phelps's possession of the modified MAC 10 under these circumstances is the very essence of the evil Congress sought to eliminate through its 1986 amendment to section 924(c).

What, after all, is this case about? It is about a major drug dealer who had converted a high-caliber semiautomatic weapon to fully automatic and was proposing to hand it over to persons he thought were also drug dealers. Did he think they were going to use it to hunt quail? Manufactured by the Military Armament Corporation of Marietta, Georgia, the MAC 10 is no pea shooter. The .45 caliber semiautomatic is 10 inches long and weighs only 6 lbs. P. Wahl, *Gun Trader's Guide* 93 (13th ed. 1987). Converted to automatic form, as this one was, it can discharge its 30–round clip in 1.5 seconds (1200 rounds per minute). While not known for its accuracy, its compact size and potential for destruction make the MAC 10 a favored weapon of drug dealers and other serious criminals:

### Weapon of Choice

### Hoodlums love the mighty MAC

No self-respecting drug dealer in South Florida would be without one. It fits inside the glove compartment of an Eldorado and can be worn in a shoulder holster under a *Miami Vice* linen jacket. The MAC–10 semiautomatic pistol is a little larger than a Colt .45, weighs a mere eight pounds [fully loaded] and sells for $360 and up. Placing a small piece of plastic behind the trigger mechanism will convert it into an illegal automatic weapon that can spit out 1,200 rounds a minute. With a silencer attached, it is as quiet as a sewing machine humming in the next room.

These qualities have made the MAC the ultimate gangster's gun, a lethal status symbol for criminals around the country. Says Stephen Higgins, director of the Department of Treasury's Bureau of Alcohol, Tobacco and Firearms: "The MAC–10 has become the weapon of choice for the nation's criminal element."

... During a shootout last month at the posh Doral Hotel in Miami Beach, a drug dealer used an automatic MAC–10 to spray bullets at four outgunned policemen. The MAC has also turned up in the arsenals of radical extremist groups. One was used to murder Denver Talk Show Host Alan Berg in 1984; a member of a neo-Nazi gang has been charged with the crime. The MAC, says one federal drug-enforcement agent, is "good for one thing and one thing only: to kill people in large numbers."

... The MAC–10 greatly outnumbers another gun favored by criminals, the compact Israeli-made UZI. That well-built weapon is more accurate, but it is more expensive at around $700 and far more complicated to convert to automatic firing.

Time, Sept. 9, 1985, at 42–43. *See also Machine Gun U.S.A.*, Newsweek, Oct. 14, 1985, at 46, 47–48 ("The MAC–10 has become the side arm of choice for 'cocaine cowboys' and other drug smugglers: south Florida, that bastion of drug smuggling on the East Coast, is said to be jampacked with MAC's and other military guns.").[1]

The simple fact is, the MAC 10 is a drug gun. *See* Time, Sept. 9, 1985, at 43 ("There's no legitimate sporting grounds for the MAC–10. Nobody goes around hunting with a weapon which fires 20 rounds a second.") (internal quotation omitted). Phelps intended to hand the MAC 10 to people he believed were drug dealers, who would use it in plying their trade. Even if we adopt the panel's unrealistic

---

**1.** For a close-up look at the MAC 10 in action, see *Betrayed* (United Artists 1988), widely available on videocassette.

assumption that Phelps's MAC 10 posed no immediate threat to those present at *this* transaction, its role as an item of drug barter meant that it would endanger police, innocent bystanders, accomplices and all others who would come face-to-face with the gun's new owners.

The relevant legislative record, overlooked by the panel, points to growing congressional alarm about the deaths and injuries inflicted by drug dealers who use guns in carrying out their illicit enterprises. An armed drug dealer is far more dangerous than one who is unarmed; Congress therefore passed section 924(c)(1) to discourage drug dealers from toting deadly weapons. By taking a deadly weapon, making it deadlier still and attempting to pass it on to other drug dealers, Phelps severely undercut the congressional purpose of keeping drug dealers unarmed. If resort to legislative history is appropriate at all under these circumstances, it is this overriding reality that should guide us—not a stray comment in a footnote of an irrelevant committee report, a comment that has nothing at all to do with this case. When properly read, the legislative record here overwhelmingly supports Phelps's conviction.

3. Conflicts with Decisions of Other Federal Courts

It's not easy to describe the many ways in which the panel's opinion conflicts with those of every other federal court to have applied section 924(c), but I will try.

A. Scienter Requirement

i. By exculpating Phelps because he lacked a belligerent motive in bringing the gun to a drug transaction, the panel adds a scienter requirement to section 924(c) that simply is not there. As noted above, Congress has expressly rejected intent as a factor under section 924(c). *See* p. 1284 supra. So has every federal court that has considered the issue. It is clear from the statute, the legislative record and the heretofore unanimous caselaw that intent to use the weapon offensively is not an element of a section 924(c) violation; all that's needed is an intent to use the weapon to facilitate *in any manner* the commission of the predicate offense. *See, e.g., United States v. Acosta–Cazares*, 878 F.2d 945, 952 (6th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989); *United States v. LaGuardia*, 774 F.2d 317, 321 (8th Cir.1985). As the Second Circuit explained in *United States v. Meggett*, 875 F.2d 24 (2d Cir.), *cert. denied sub nom. Bradley v. United States*, —— U.S. ——, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989),

> the cases are unanimous in holding that a defendant can "use" a firearm within the meaning of § 924(c)(1) without firing, brandishing or displaying it. Possession of a gun, even if it is concealed, constitutes "use" if such possession is an integral part of the predicate offense and facilitates the commission of that offense.

*Id.* at 29.

The panel's error stems from a misreading of our decision in *United States v. Stewart*, 779 F.2d 538 (9th Cir.1985). The panel quotes a passage from *Stewart* in which we stated that section 924(c) applies where the gun " 'facilitated or had a role in the crime, *such as* emboldening an actor,' " 877 F.2d at 31 (emphasis added) (quoting *Stewart*, 779 F.2d at 540); it then reverses Phelps's conviction because the MAC 10 did not "embolden the actor within the meaning of *Stewart....*" *Id.* But this ignores the important qualifier "such as." We did not hold in *Stewart* that section 924(c) applies only to defendants who are more willing to take chances because they have a gun; we identified this as merely one possible way a gun could facilitate the underlying crime, clearly allowing that there were other ways possession of a gun could violate the statute.

*Stewart* actually supports Phelps's conviction. Stewart was arrested on drug manufacturing charges while sitting in his car in front of his home; a sawed-off UZI was found in the trunk. The question was whether the UZI, completely out of Stewart's reach and away from the premises where drugs were found, was used "in relation to" the drug manufacturing of-

fense. While we reversed Stewart's section 924(c) conviction because of an inadequate jury instruction, we held that "[u]nder the evidence adduced at trial, the government might have made a case sufficient to sustain the firearms conviction, if the jury had been properly instructed." *Id.* at 539. If Stewart could have been convicted because there was a gun hidden in the trunk of a car containing no drugs, how can one credibly argue that Phelps could not be convicted for bringing a gun to the place where drugs were being manufactured and an exchange negotiated? The panel's decision here creates an intra-circuit conflict with *Stewart.*

ii. The panel's imposition of a scienter requirement also conflicts with a host of cases from other circuits. Most obviously, it is in conflict with cases where defendants (always unsuccessfully) have sought reversal of their convictions because they claimed to have non-belligerent reasons for possessing guns. *See, e.g., Meggett,* 875 F.2d at 26 (defendant claimed to be a gun collector); *United States v. Raborn,* 872 F.2d 589, 595 (5th Cir.1989) (defendant claimed that he carried a gun for protection from muggers). More generally, however, the panel's decision runs afoul of many cases in which convictions have been upheld as to defendants who had guns they could not have intended to use offensively because the guns were unloaded, *see, e.g., United States v. Coburn,* 876 F.2d 372, 375 (5th Cir.1989); nonfunctional, *see, e.g., United States v. York,* 830 F.2d 885, 891–92 (8th Cir.1987), *cert. denied,* 484 U.S. 1074, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988) (no firing pin); or mere toys, *cf. Reed v. Butler,* 866 F.2d 128 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 1963, 104 L.Ed.2d 431 (1989) (state law).

*Coburn* is a typical example. There, the Fifth Circuit upheld the section 924(c)(1) conviction of a woman who drove a pickup truck with marijuana stored in the gas tank, because she had an unloaded shotgun mounted on the truck's rear window. She did not own the truck, 876 F.2d at 374, may

not have owned the shotgun, *id.* at 375, and she had no shells. *Id.* at 373. All the same, the court affirmed the conviction, noting that "an unloaded firearm is a dangerous weapon capable of provoking a violent response." *Id.* at 375. This is consistent with the Supreme Court's holding that, given the dangerous nature of guns generally, "the law reasonably may presume that such an article is *always* dangerous even though it may not be armed at a particular time or place." *McLaughlin v. United States,* 476 U.S. 16, 17, 106 S.Ct. 1677, 1678, 90 L.Ed.2d 15 (1986) (emphasis added).[2]

The panel's decision here raises serious doubts as to whether Coburn's conviction and many others like it could be upheld in our circuit. If Phelps's conviction must be reversed because, although he had a machine gun, he wasn't planning to use it offensively, how can any conviction stand where the defendant was armed with a gun incapable of being fired, either because it was unloaded, had no firing pin or was merely a water pistol? At the very least, the panel's decision provides defendants in the Ninth Circuit a defense to a section 924(c) charge that is not available anywhere else in the country.

The fact is, intent to do harm is *not* an element of a section 924(c) offense, and with very good reason. The mere presence of a weapon heightens the risk of violence and injury always present in any criminal endeavor. This is true whether the gun is loaded or unloaded, whether it is brandished in a threatening manner or remains tucked in a waistband. Here, Phelps deliberately brought an automatic weapon to a drug exchange. The weapon was not boxed or inaccessible or hidden from view; it was the center of attention. Moreover, Phelps also brought along a silencer and plenty of ammunition. That the gun was present as an item of barter made it no less dangerous than the guns in *Coburn, Meggett, Raborn* and a host of other cases applying section 924(c); indeed, it was more

---

2. In *McLaughlin,* the Court was talking about ordinary handguns. The point applies with

even more force here, where Phelps had turned the MAC 10 into a machine gun.

so, as it was readily accessible and Phelps had several loaded clips with him.

Once a weapon is present at the scene of a drug crime, the purpose for which it was brought matters not at all. The undercover agents refused Phelps's invitation to test-fire the gun, but bona fide drug dealers might not have been so reticent.[3] Or, Phelps could have ignored their refusal, loaded a magazine and test-fired the weapon himself. Or, he might have brought the weapon along to serve a dual purpose: item of barter and means of protection. Or, a bystander could have happened on the scene, causing Phelps to panic, snap in a clip and open fire. Or, local police, unaware that federal undercover agents were involved, could have attempted a drug bust. Or, the drug deal could have gone sour. Or, the undercover agents might have decided to arrest Phelps on the spot. There are any number of not implausible scenarios where the MAC 10 could have been used to injure or kill somebody.

Guns in the hands of drug dealers are inherently dangerous.[4] Section 924(c) therefore imposes "severe sanctions where firearms facilitated, *or had the potential of facilitating,* the commission" of certain serious crimes. *Stewart,* 779 F.2d at 540 (emphasis added). *Accord Coburn,* 876 F.2d at 375. Thus, our cases and those of other circuits have consistently affirmed convictions involving guns that were unloaded, inoperable, or even toys—none of which could be used to injure people. As we have recognized, the statute merely requires "some relation or connection between the underlying criminal act and the use or possession of the firearm." *Stewart,* 779 F.2d at 540. In reversing Phelps's conviction, the panel departs from a substantial body of precedent, putting us in conflict with every other federal court that has considered the issue.

## B.   The Existence of a Conspiracy

Up to this point, I have accepted the panel's premise that the predicate "drug trafficking crime" for purposes of section 924(c) was a single drug swap with the federal agents. For the reasons explained above, the panel errs gravely even if the case is viewed in such an abstract fashion. But this is not, in fact, the case presented to us on appeal. Defendant here was charged not with a single act of possession or distribution, but with two wide-ranging conspiracies, one to manufacture and another to possess with intent to distribute methamphetamine. It is these conspiracies, not merely the isolated meeting with the undercover agents, that formed the predicate offenses for the section 924(c) count in the indictment.[5]

A great many cases have addressed challenges to section 924(c) convictions where the underlying offense was a conspiracy; all have reached the same conclusion: The conviction will be upheld even if the firearm was not present at the scene of any drug transactions, let alone used offensively, so long as it was present at *some* stage of the conspiracy.

For example, in *Meggett,* defendant's weapons were nowhere near any of the drug transactions charged in the indict-

---

3.  Of course, under the panel's rationale, even had the agents accepted Phelps's invitation to load and shoot the gun, that would not have violated section 924(c) because the firing of the weapon would have been motivated by the barter, not by anger or an intent to do harm.

4.  The unreality of the panel's myopic characterization of the gun as nothing but an item of barter is disclosed by what happened next. Less than three hours after Phelps first showed the MAC 10 to the federal undercover agents, he was stopped by local police for outstanding traffic warrants. The MAC 10, suddenly transmogrified into an offensive weapon, was still in his possession; Phelps opened fire and shot a deputy sheriff. CR 42 at 5; CR 43 at 10; CR 70 at

5-6.  Can there be any doubt that the two federal agents would have suffered the same fate had Phelps suddenly discovered their ruse? While the shooting of the deputy sheriff forms the basis of a separate state conviction and was considered here only during sentencing, it demonstrates as vividly as anything can that drug dealers are in a constant state of war with civilized society, making them extremely dangerous when armed.

5.  Count five of the superceding indictment charged defendant with possession of the MAC 10 "during and in relation to a drug trafficking crime ..., namely *conspiracy* to manufacture and to possess with intent to distribute methamphetamine." CR 9 at 5 (emphasis added).

ment; they were stored at defendant's apartment and only, he claimed, as collectors' items. In affirming the conviction, the Second Circuit concluded that the guns need not have been present or used at the scene of the transactions; their mere presence at a separate location near where the drugs were stored and processed supported the jury's finding that the weapons "furthered or facilitated the narcotics operation and [were] an integral part thereof." 875 F.2d at 29. The court reasoned that the crime of conspiracy does not begin or end with a particular drug deal; what happens at home base, where the drugs are manufactured and stored, is just as much a part of the conspiracy as what happens in the field. *Id.* This is exactly what we held in *Stewart* when we suggested that defendant could be convicted for having a gun in his car, away from where he stored and manufactured drugs. 779 F.2d at 539. *Accord United States v. Matra*, 841 F.2d 837, 841–43 (8th Cir.1988) (upholding the conviction even though the gun was locked in another room).

The panel's opinion is most clearly in conflict with *United States v. Johnson*, 658 F.2d 1176 (7th Cir.1981). As in this case, the defendant in *Johnson* engaged in drug transactions with undercover agents. Also, as in this case, the defendant in *Johnson* had a gun, but it clearly posed no danger to the undercover agents *during* the transactions: Each time the agents met with Johnson, they frisked him and took away his gun. *Id.* at 1178. On appeal, Johnson argued, accurately enough, that he could not have used the gun during the transactions because the agents had taken it. The Seventh Circuit agreed but nevertheless affirmed the conviction:

> [I]t is undisputed that prior to being disarmed Johnson had formulated the intent to distribute the cocaine and had en-

gaged in acts in furtherance of the distribution.... Exclusion of Johnson from the statute would contravene the purpose of the statute—that is, decreasing the use and carrying of firearms in felony cases. *Up to the time the gun had been removed Johnson was engaged in felonious activity and his possession of the gun posed a danger to those individuals involved in the drug transaction.*

*Id.* at 1181 (emphasis added).

The facts here are far more egregious than those in *Johnson.*[6] Johnson had given up his gun; Phelps retained control over the MAC 10 and could have used it at the drop of a hat. But even if we discount that possibility entirely, as the panel does, the outcome here cannot be reconciled with *Johnson* and *Meggett.* The logic of these cases would require us to affirm Phelps's conviction on the basis of evidence that the gun was present at a place where drugs were stored or processed at some point during the conspiracy.[7] Here, there was both direct and circumstantial evidence of this: In arranging the drug swap, Phelps and his partner gave the two undercover federal agents a tour of Turnipseed's apartment where the laboratory was located; Phelps had the gun with him. While the DEA agent dickered with Turnipseed about drugs, Phelps regaled the BATF agent with tales about the joys and benefits of MAC 10 ownership. RTI 56–57. There was also testimony that Phelps made it his business to modify MAC 10s by turning them into automatic weapons, RTI 114, and that he even built a silencer for one of them. RTI 113. To have done so, he had to have had possession of the weapon at some prior time, as he went about the business of manufacturing and distributing drugs. Hearing this evidence, the jury could have easily concluded that Phelps had his MAC 10 at his drug manufacturing

---

6. The district judge was fully aware of *Johnson,* as government counsel brought this case to the court's attention while debating the precise issue addressed in the panel's opinion—the meaning of the "in relation to" requirement. *See* RTII 59–60.

7. In *Meggett,* as here, the indictment charged the defendant with violating section 924(c) on or

about a particular date. *See* 875 F.2d at 26; CR 9 at 5. The *Meggett* court determined that this was not a problem, as the gun was present on the relevant day at a place where drugs had been stored or processed at some point during the conspiracy, *see* 875 F.2d at 29; precisely the same is true here.

plant at various points during the course of the conspiracy, including the time he was there with the two undercover agents.

Our cases and those of our sister circuits have been unanimous in holding that where there is sufficient evidence to convict a defendant of a drug trafficking crime, the bare presence of a gun is sufficient for a jury to infer that the gun was used "in relation to" the drug offense. *See, e.g., United States v. Brockington,* 849 F.2d 872, 876 (4th Cir.1988) (evidence of drug possession with intent to distribute, "coupled with the common sense recognition that drug dealing is a dangerous and often violent enterprise, more than supports an inference that Brockington carried the weapon to facilitate his 'business'") (citation omitted); *Coburn,* 876 F.2d at 375.

This is precisely the point Judge Kennedy made in *Stewart.* In response to defendant's argument that the UZI in his trunk could not possibly have had anything to do with his drug manufacturing operations, Judge Kennedy wrote for the court: "Given the use of firearms in some drug transactions, and the known risks of conducting an illegal drug business, the jury could infer from all of the evidence that Stewart's possession of the UZI outside his residence was intended to facilitate the drug operation or secure the premises where contraband and other evidence were located." 779 F.2d at 539 (citations omitted).

On this record, it is not difficult to construct a variety of non-fanciful theories as to how the MAC 10 could have been used by Phelps in furthering the aims of his drug manufacturing and distribution conspiracies. Even if we join the panel in ignoring the direct and immediate boost Phelps got from using the gun as bait to lure prospective suppliers of Ephedrine, how about the fact that he had the gun at the very premises where he manufactured the drugs? What, for example, if Phelps had been cornered by police, or if rival drug lords had tried to cut in on his turf? Under the panel's theory that the gun was

merely inventory, I suppose Phelps would have immediately laid down the MAC 10 and defended his laboratory by chunking Erlenmeyer flasks at the intruders.[8]

By reversing Phelp's section 924(c) conviction on this record, the panel cuts a large hole deep into the heart of the statute. The panel in effect holds that a defendant's professed lack of intent to use the gun belligerently during a particular drug transaction sanitizes his unlawful use and possession of the gun during all other phases of a complex and far-reaching drug conspiracy. Under this dangerous new theory, hardened criminals like Phelps can run a drug manufacturing plant and an armory on the same premises and escape punishment under section 924(c) by claiming that the guns were merely stock-in-trade.

I can't believe this is what Congress envisioned when it passed section 924(c) and, as noted, no other federal court has been willing to gut the statute in this manner. Quite the contrary, it seems to me that what Phelps did here is precisely what Congress sought to punish in passing section 924(c). By letting Phelps off the hook under these circumstances, the court issues an invitation to any number of lesser hoodlums to manufacture a defense against a section 924(c) conviction by claiming they held their weapons for some non-belligerent purpose.

### Conclusion

The court today makes a grave error in letting stand a decision that is factually incorrect, statutorily indefensible and socially unwise. Moreover, it is a decision that places us squarely in conflict with our sister circuits, as the panel repeatedly embraces arguments that have been rejected by every other federal court of appeals that has had occasion to consider them. Uniquely in the Ninth Circuit, which contains "about twenty percent of the population of this country and half its land mass," *Cunningham,* 890 F.2d at 200 (O'Scannlain, J., dissenting from the order rejecting

---

**8.** That Phelps was perfectly willing and able to use the MAC 10 (and its six predecessors) for its normal purpose when confronted by law enforcement agents was demonstrated only too vividly. *See* n. 4 *supra.*

the suggestion for rehearing en banc), our nation's desperate effort to keep deadly weapons out of the hands of drug dealers has been dealt a serious blow. I must respectfully dissent.