UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-3453
Summary Calendar
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARTA ALICIA ZUNIGA,

Defendant-Appellant.


* * * * * * *

_____

No. 93-3457
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN JOSE ZUNIGA-HERNANDEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Eastern District of Louisiana
_____

(April 5, 1994)


Before GARWOOD, SMITH and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants Juan Jose Zuniga-Hernandez (Zuniga) and his wife, Marta Alicia Zuniga (Marta), were convicted in separate proceedings of various drug-related offenses. In this consolidated appeal, Zuniga asks us to reverse his conviction under 18 U.S.C. § 924(c)(1) and the sentence imposed therefor, arguing that his receipt of firearms in exchange for heroin did not constitute "use" of a firearm, during and in relation to a drug trafficking offense, within the context of the statute. Marta contests the sufficiency of the evidence underlying her conviction of distribution of heroin. Furthermore, she claims that she was only a minor participant in the offense and should have been accorded a downward adjustment to her guidelines offense level on that basis.

## Facts and Proceedings Below

In September 1992, a cooperating individual contacted the Drug Enforcement Administration (DEA) with information concerning an organization in Houston, Texas, dealing in heroin and firearms. According to information obtained by the DEA, Zuniga was the head of the organization. DEA Special Agent Guadalupe Flores, working undercover, contacted Zuniga to negotiate the purchase of heroin and the sale of machineguns and other firearms. The purchase price agreed upon for the heroin was $5,000 per ounce. To disguise the nature of their arrangements, Agent Flores and Zuniga referred to heroin as "shoes" and to firearms as "machinery."

The cooperating individual maintained contact with Zuniga throughout October and November 1992.[1] Sometime during the autumn

---

[1] Throughout the investigation, where possible, DEA agents monitored and recorded the cooperating individual's contacts with

of 1992, Agent Flores agreed to purchase a one-ounce sample of black tar heroin from Zuniga and to purchase more if the sample proved satisfactory. Zuniga expressed his interest in acquiring firearms from Agent Flores.

On December 8, 1992, DEA agents conducted surveillance of a meeting at Zuniga's apartment complex in Houston. While Agent Flores waited in his vehicle, the cooperating individual went to Zuniga's apartment and asked Zuniga to meet with Agent Flores at the car. Zuniga gave the one ounce of black tar heroin to the cooperating individual and followed him to the car, where Agent Flores paid Zuniga $1,000, the agreed-upon partial payment for the one-ounce sample.

On the following day, Zuniga and his father, Salvador Zuniga (Salvador), travelled from Houston to New Orleans to receive the $4,000 balance owed for the one ounce of heroin and to negotiate further heroin transactions, as well as the purchase of firearms. Zuniga and Salvador met with undercover agents of the DEA, including Agent Flores, and of the Bureau of Alcohol, Tobacco and Firearms (ATF).[2] The agents paid Zuniga the $4,000 and showed him semi- and fully-automatic rifles which the agents purported to be able to supply.

During this meeting, the agents agreed to purchase four ounces more of heroin from Zuniga and arranged for the cooperating individual to return to Houston to pick up the heroin from Marta,

Zuniga.

[2] The ATF agents were involved in the firearms aspect of the investigation.

at Zuniga's apartment. Zuniga telephoned his wife from New Orleans to tell her that the cooperating individual would be coming to pick up the "shoes."[3] The agents agreed to pay Zuniga for the four ounces of heroin once the cooperating individual had received the heroin. The parties also arranged for an ATF special agent to travel to Atlanta to obtain weapons requested by Zuniga.

On December 10, 1992, DEA Special Agent Randy Goodson, who was the case agent for the Zuniga investigation, flew to Houston from New Orleans, accompanied by the cooperating individual. The cooperating individual telephoned Marta and told her he was in town to pick up the "shoes." Under DEA surveillance, the cooperating individual entered Zuniga's apartment and emerged approximately five minutes later with a clear plastic bag which contained four ounces of black tar heroin.[4] While in Zuniga's apartment, the cooperating individual telephoned Zuniga and Agent Flores in New Orleans to inform them that he had received the four ounces of heroin from Marta. Agent Goodson and the cooperating individual

---

[3] The facts surrounding the cooperating individual's actions in obtaining the four ounces of heroin are contested. For example, in his testimony for the defense at Marta's trial, Zuniga stated that he told Marta over the telephone that the cooperating individual would be by to pick up a small plastic container.

[4] The government states in its brief, without reference to the record, that the bag contained three and a half ounces of heroin. Three and a half ounces is 99.225 grams. The presentence report (PSR) prepared for Marta, however, set the amount at 107 grams, or approximately four ounces, of heroin. Marta did not object to the PSR's statement of the quantity of heroin in this bag as being 107 grams, and the district court determined her offense level to be 26, for offenses involving 100 to 400 grams of heroin. She does not challenge her sentence on this basis on appeal.

4

then returned to New Orleans.

Later on December 10, Zuniga and Salvador met with the undercover agents and the cooperating individual in Jefferson Parish, Louisiana, where they were shown various firearms. Zuniga agreed to take several of the firearms; as payment for these firearms, he allowed a $5,000 credit against the $20,000 owed for the four ounces of heroin obtained by the cooperating individual. Zuniga and Salvador helped load the firearms, which included two machineguns, in the trunk of an automobile. The agents drove Zuniga and Salvador to another location in Jefferson Parish, ostensibly to pick up the $15,000 still owed for the four ounces of heroin. Zuniga and Salvador were then arrested.

On February 17, 1993, a grand jury returned a superseding indictment charging Zuniga, Marta, and Salvador with conspiracy to distribute heroin (count one) and distribution of heroin (count two), in violation of 21 U.S.C. §§ 846, 841(a)(1). In addition, Zuniga and Salvador were charged with two firearms offenses: using and carrying firearms and machineguns during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) (count three), and possession of machineguns in violation of 18 U.S.C. § 922(o)(1) (count four).

Zuniga pleaded guilty to all four counts and was sentenced to concurrent terms of seventy-eight months imprisonment on each of the conspiracy, distribution, and firearms possession counts. The district court imposed a consecutive term of thirty-years imprisonment on count three, for use of a machinegun during and in relation to a drug trafficking offense.

5

Marta was tried and acquitted of the conspiracy charge, but the jury convicted her of knowing and intentional distribution of heroin, as charged in count two of the superseding indictment. The district court sentenced her to sixty-five months imprisonment and three years supervised release.

Both defendants filed timely notices of appeal.[5] We have consolidated their appeals and now affirm.

**Discussion**

I. Zuniga's Appeal

On appeal, Zuniga's sole challenge is to his conviction under 18 U.S.C. § 924(c)(1), count three of the superseding indictment. This section enumerates the penalties faced by a defendant who "during and in relation to any . . . drug trafficking crime . . ., uses or carries a firearm."[6] The government must make two showings: (1) that Zuniga used or carried a firearm and (2) that he did so during and in relation to a drug trafficking crime. Zuniga's primary contention is that, at the time of his conduct, bartering drugs for weapons did not constitute "use" of a weapon within the context of section 924(c)(1).

The government contends that Zuniga has waived this issue

_____

[5]     Salvador pleaded guilty to a superseding bill of information charging him with misprision of the machinegun possession charge. He is not a party to this appeal.

[6]     Zuniga received a term of thirty years imprisonment on count three because two of the firearms received as partial payment for the heroin were fully automatic assault rifles, or machineguns, which carry a higher penalty. 18 U.S.C. § 924(c)(1). The term "machinegun" is defined as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(23).

6

because he did not raise it below in the context of his guilty plea.[7]   Assuming, *arguendo*, that we may properly review this contention, we find no merit in it.

Our court had not had opportunity to address this exact issue prior to the time of Zuniga's conduct.  We had, however, construed section 924 broadly in other contexts.  *See, e.g.*, *United States v. Blake*, 941 F.2d 334, 342 (5th Cir. 1991) ("The government may meet its burden by showing that the weapon involved could have been used to protect, *facilitate, or have the potential of facilitating* the operation, and the presence of the weapon was *in some way connected* with the drug trafficking.") (emphasis added), *cert. denied*, 113 S.Ct. 596 (1992).   For more recent opinions of this Court indicating the breadth of this provision, see *United States v. Singleton*, No. 93-3479, slip op. 3258, 3261-63, 3262 n.17 (5th Cir. Mar. 10, 1994); *United States v. Guerrero*, 5 F.3d 868, 870-873 (5th Cir. 1993).

On June 1, 1993, a few days before Zuniga's sentencing, the Supreme Court addressed this issue, holding that "using a firearm in a guns-for-drugs trade may constitute `us[ing] a firearm' within the meaning of § 924(c)(1)."  *Smith v. United States*, 113 S.Ct.

---

[7]   Although Zuniga did not challenge count three of the indictment on this ground, at his rearraignment, the district court observed in passing that his offense conduct fell within the confines of section 924(c)(1):

> "The Government is not required to prove that you actually fired or brandished the weapon in order to prove use as that term is used herinabove [sic].  In fact, the term use is broad enough to cover the situation alleged hereinSQthat is, that the guns were used as a medium of exchange in a trade for drugs."

7

2050, 2058 (1993). In *Smith*, the petitioner owned a fully automatic MAC-10 firearm, which he agreed to trade to an undercover officer for two ounces of cocaine. The officer indicated that he would try to obtain the cocaine; he left to arrange the petitioner's arrest. The contemplated exchange never occurred, however, because, before the officer's return, the petitioner left his motel room and was arrested following a high-speed chase.

The Court affirmed the petitioner's conviction, holding that "[b]oth a firearm's use as a weapon and its use as an item of barter fall within the plain language of § 924(c)(1), so long as the use occurs during and in relation to a drug trafficking offense . . . ." *Id*. at 2060.[8] The Court observed that its holding was in line with Congress's intent to decrease the possibility of violence and death posed by the presence of firearms during drug offenses. "The fact that a gun is treated momentarily as an item of commerce does not render it inert or deprive it of destructive capability. Rather, as experience demonstrates, it can be converted instantaneously from currency to cannon." *Id*.

Zuniga attempts to avoid the ruling in *Smith*, arguing that application of that ruling to his 1992 conduct would implicate *ex post facto* considerations. The Due Process Clause of the Fifth

---

[8]    In so holding, the Court relied in part upon the language of 18 U.S.C. § 924(d), subsection (1) of which provides that any "firearm or ammunition intended to be used" in the offenses listed in section 924(d)(3) is subject to seizure or forfeiture. The Court observed that, while section 924(d)(3) does list several offense in which firearms might be used as weapons, the section includes other offenses in which firearms are items of commerce, such as the interstate transport of prohibited firearms. *See Smith*, 113 S.Ct. at 2057.

8

Amendment protects a defendant from retroactive application of unforeseeable judicial enlargement of criminal statutes. *Marks v. United States*, 97 S.Ct. 990, 993 (1977). The Court's decision in *Smith* was not unforeseeable, however, because it resolved a conflict among the Courts of Appeals on this issue which existed at the time of Zuniga's offense.

In April 1992, in its consideration of the *Smith* case, the Eleventh Circuit concluded that trading guns for drugs satisfied section 924(c)(1)'s requirement that the firearm be used during and in relation to a drug trafficking offense. *United States v. Smith*, 957 F.2d 835, 836-7 (11th Cir. 1992), *aff'd*, 113 S.Ct. 2050 (1993). Also in April 1992, the District of Columbia Circuit reached the same conclusion in *United States v. Harris*, 959 F.2d 246, 261-62 (D.C. Cir.), *cert. denied*, 113 S.Ct. 362, 364 (1992). These cases expressly disagreed with a prior decision of the Ninth Circuit, in which that court reversed a defendant's conviction under section 924(c)(1), holding that an attempt to trade a firearm for ephedrine to be used in manufacturing methamphetamine did not fall within the confines of that statute. *United States v. Phelps*, 877 F.2d 28, 29-31 (9th Cir. 1989).

Where a split exists among the circuits, it is reasonably foreseeable that the Supreme Court may resolve that conflict adversely to the defendant. *United States v. Rodgers*, 104 S.Ct. 1942, 1949 (1984) ("any argument by respondent against retroactive application to him of our present decision, even if he could establish reliance upon [an earlier Eighth Circuit] decision, would be unavailing since the existence of conflicting cases from other

Courts of Appeals made review of that issue by this Court and decision against the position of the respondent reasonably foreseeable").  At the time of his conduct, in December 1992, Zuniga could reasonably have foreseen that the Supreme Court would address the conflict among the Courts of Appeals concerning the interpretation of section 924(c)(1) in the present context and resolve the issue, as it did in *Smith*, adversely to him.  Therefore, application of the rule established in *Smith* to Zuniga's conduct does not violate the Fifth Amendment.

Zuniga also contends that, even if the bartering of drugs for firearms constituted "use" for purposes of section 924(c)(1), he did not so use the firearms during *and* in relation to a drug trafficking crime.  He bases his argument on a narrow view of "drug trafficking crime," arguing that the exchange of drugs for guns was independent of the heroin distribution crime because each transaction was separate:  the first sale of one ounce of heroin to Agent Flores in Houston, the delivery two days later of the four ounces of heroin to the cooperating individual in Houston, and the inspection and purchase of the guns in New Orleans.

This contention ignores the conspiratorial aspect of this offense, as well as the obvious interrelation of the different events.  The payment for the one ounce of heroin was made in two stages, $1,000 at the time of delivery in Houston, and $4,000 the next day in New Orleans.  The payment of the balance occurred at a meeting during which undercover agents produced firearms for Zuniga's inspection and negotiated with him the delivery of, and payment for, the remaining four ounces of heroin.  Moreover, Zuniga

10

accepted the firearms as partial payment for the four ounces of heroin.

Far from being a separate crime, the drugs-for-guns trade occurred as part of, or "during," the conspiracy to distribute heroin. *See Smith*, 113 S.Ct. at 2058 ("There can be no doubt that the gun-for-drugs trade was proposed during and in furtherance of th[e] interstate drug conspiracy."). Furthermore, the trade was "in relation to" the drug trafficking crime. As in *Smith*, the presence of the firearms was not incidental, but rather an essential part of the negotiations. *Id*. at 2059 ("On the contrary,`[f]ar more than [in] the ordinary case' under § 924(c)(1), in which the gun merely facilitates the offense by providing a means of protection or intimidation, here `the gun . . . was an integral part of the transaction.'") (quoting *United States v. Phelps*, 895 F.2d 1281, 1283 (9th Cir. 1990) (Kozinski, J., dissenting from denial of rehearing en banc)).

Finally, in the present setting we do not regard *Smith* as distinguishable on the basis that here the defendant owned the drugs and was bartering them for the firearms, while in *Smith* the defendant owned the firearm and was bartering it for the drugs.

We affirm Zuniga's conviction and sentence under 18 U.S.C. § 924(c)(1).

II. Marta's Appeal

Marta challenges her conviction and her sentence, the former on the ground that the evidence was insufficient to support her conviction, and the latter on the theory that she was entitled to a downward adjustment to her offense level for her role as an

11

allegedly minor participant in the offense.

A.    Sufficiency of the Evidence[9]

Upon a claim of insufficient evidence to support a conviction, we review the evidence, whether direct or circumstantial, and all the inferences reasonably drawn from it, in the light most favorable to the verdict. *United States v. Salazar*, 958 F.2d 1285, 1290-1291 (5th Cir.), *cert. denied*, 113 S.Ct. 185 (1992). We must affirm the conviction if we determine that any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 99 S.Ct. 2781, 2789 (1979).

Marta's challenge to the evidence underlying her conviction turns on a credibility issue, a choice between her version of the events at her apartment on December 10 or that of the cooperating individual. She contends that she did not understand the cooperating individual's reference to "shoes" over the telephone. Although she did not know the cooperating individual well, she let him into the apartment because she believed he was a friend of her husband. According to her account of the facts, the cooperating individual asked permission to use the telephone, which he took to the bedroom to make his call. When he emerged, he was talking about "sausage and stuff like that," which Marta did not understand. Upon his request, she handed him an empty, plastic, sandwich-type bag before he left the apartment.

---

[9]    Although defense counsel for Marta moved for judgment of acquittal at the close of the government's case, he did not renew this motion at the close of all the evidence. However, even had the proper motions been made, the evidence would have been amply sufficient, as demonstrated in the text.

12

The cooperating individual, however, testified that he told her, when he telephoned to let her know he was in Houston, that he would pick up the "shoes," without further explanation, and that she knew why he was there. When he arrived at the apartment, he again told her he was there to pick up the "shoes," whereupon she handed him a plastic bag. The plastic bag contained four ounces of black tar heroin when she handed it to him. Before leaving the apartment, the cooperating individual called Zuniga in New Orleans to tell him Marta had given him the "shoes."

Although both versions may be plausible, it was within the sole province of the jury as the fact finder to decide the credibility of the witnesses and to choose among reasonable constructions of evidence. *United States v. Garza*, 990 F.2d 171 (5th Cir.), *cert. denied*, 114 S.Ct. 332 (1993). We will not second guess the jury in its choice of which witnesses to believe. *United States v. Jones*, 839 F.2d 1041, 1047 (5th Cir.), *cert. denied*, 108 S.Ct. 1999 (1988).

Viewing the evidence in the light most favorable to the verdict, a reasonable jury presented with both versions of what transpired between Marta and the cooperating individual could have chosen to believe the cooperating individual and thus found, beyond a reasonable doubt, that she knowingly and intentionally distributed the heroin to the cooperating individual.

We conclude that the government presented sufficient evidence to support Marta's conviction for distribution of heroin.

B.    Role in the Offense

Marta next contends that she was a minor participant in the criminal activity, and therefore, the district court should have accorded her a two-level downward adjustment to her base offense level, pursuant to U.S.S.G. § 3B1.2.[10]  She preserved this issue for appeal with her objection to the PSR on this ground.  The district court overruled her objection.  Marta was not convicted of the conspiracy count, and the court did not attribute to her, for sentencing purposes, any conduct other than her role of delivering the four ounces of heroin to the cooperating individual.

We will uphold a sentence imposed under the Sentencing Guidelines so long as it is the result of a correct application of the Guidelines to factual findings which are not clearly erroneous. *United States v. Alfaro*, 919 F.2d 962, 964 (5th Cir. 1990).  We review determinations of legal principles *de novo* and factual findings for clear error. *United States v. Mourning*, 914 F.2d 699, 704 (5th Cir. 1990).  A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole. *United States v. Sanders*, 942 F.2d 894, 897 (5th Cir. 1991).  The determination of a defendant's role in an offense is factual in nature, subject to review for clear error.  *United States v.*

------

[10]    Section 3B1.2(b) allows a two-level reduction in an offense level if the defendant was a minor participant in the criminal activity.  The commentary to this section defines a minor participant as "any participant who is less culpable than most other participants, but whose role could not be described as minimal."  U.S.S.G. § 3B1.2, comment. (n.3).  A minimal participant is one who is "plainly among the least culpable of those involved in the conduct of a group," such as one who offloads part of a single shipment of marihuana in a large smuggling operation.  *Id*. at nn. 1-2.

14

*Palomo*, 998 F.2d 253, 257 (5th Cir.), *cert. denied*, 114 S.Ct. 358 (1993).

The district court was not required to grant Marta the two-level reduction merely because she was less culpable than her codefendants. The commentary to section 3B1.2 makes clear that a downward adjustment under its provisions is generally appropriate only where the defendant was "*substantially less culpable* than the average participant." U.S.S.G. § 3B1.2, comment. (backg'd); *United States v. Gadison*, 8 F.3d 186, 197 (5th Cir. 1993). Marta bears the burden of proving, by a preponderance of the evidence, her minor role in the offense. *United States v. Brown*, 7 F.3d 1155, 1160 n.2 (5th Cir. 1993).

The jury, in convicting her of distribution of heroin, rejected her testimony, in which she disclaimed any knowledge of the contents of the plastic bag, her husband's illegal activities, or the use of the term "shoes" to signify heroin. The district court likewise found her version of the disputed events to be less than credible.[11] We agree. Her role in delivering the four ounces of heroin to the cooperating individual was not unimportant. She

---

[11] At Marta's sentencing hearing, the district court stated:

"As to [Marta's role in the offense], the Court can hardly characterize the defendant's role in the heroin conspiracy as minor. In fact, she and her husband apparently worked as a team, Marta handling the drug handoff on the homefront in Houston; while her husband, Juan, contemporaneously handled the related gun transaction in New Orleans. Defense counsel's statement that this defendant was not involved in any transaction with the confidential informant is simply inaccurate and belied by the confidential informant's credible testimony at trial. Accordingly, the Court is of the opinion that no revision is appropriate."

15

was entrusted with custody of the four ounces of heroin, and she arranged to be available at the apartment to receive the cooperating individual's telephone call and to complete the actual delivery. Furthermore, her acquittal of the conspiracy charge does not affect the importance of her actions in the distribution of the heroin or require the district court to accept her protestations of ignorance and noninvolvement.

The district court's determination that Marta had not carried her burden below to show that she was substantially less culpable than an average participant, and thus was not entitled to the requested downward adjustment, is not clearly erroneous.

## Conclusion

For the reasons discussed above, the convictions and sentences of Juan Jose Zuniga-Hernandez and his wife, Marta Alicia Zuniga, are

AFFIRMED.