UNITED STATES of America

v.

Lamar HARRIS, a/k/a
Cheese, Appellant.

UNITED STATES of America

v.

Gary WYCHE, a/k/a Gary Gunter,
Drago, Appellant.

UNITED STATES of America

v.

Donald JOHNSON, a/k/a
Danny, Appellant.

UNITED STATES of America

v.

Michael PALMER, a/k/a Knot,
Tony, James, Appellant.

UNITED STATES of America

v.

Richard A. SMITH, a/k/a Rich,
Mo, Richmo, Appellant.

Nos. 89–3205 to 89–3207, 89–
3217 and 89–3218.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 8, 1991.

Decided Feb. 19, 1992.

As Amended April 3, 1992.

Daniel Ellenbogen, Washington, D.C., for appellants in 89–3205, 89–3206, 89–3207, 89–3217 and 89–3218.

Mary E. Davis, Washington, D.C., (appointed by the Court), for appellant Richard A. Smith in 89–3218.

Ronald D. Maines, Washington, D.C., (appointed by the Court), for appellant Michael Palmer in 89–3217.

G. Godwin Oyewole, Washington, D.C., (appointed by the Court), for appellant Donald Johnson in 89–3207.

Robert E. Sanders, Washington, D.C., (appointed by the Court), for appellant Gary Wyche in 89–3206.

Dennis M. Hart, Washington, D.C., was on the joint brief, for appellant Lamar Harris in 89–3205.

Ralph J. Caccia, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Judith E. Retchin, Merrick B. Garland and Ann K.H. Simon, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee in all cases.

Before: RUTH BADER GINSBURG and SILBERMAN, Circuit Judges, and THOMAS,* Circuit Justice.

Opinion for the Court filed PER CURIAM.

PER CURIAM:

Five defendants convicted on various charges relating to their drug distribution operations appeal their convictions and sentences. They raise a number of challenges to the conduct of the trial, to the jury instructions, and to the sentencing decisions. We reject all procedural challenges but find the objection to the jury instructions on one of the counts to be well-taken and reverse as to that count. We reject all of the sentencing challenges except two by Gary Wyche, who is entitled to resentencing.

I.

The evidence introduced by the government showed that Michael Palmer, Lamar Harris, Richard Smith, Gary Wyche, and Donald Johnson were participants in a large-scale drug distribution business. Their story is a tangled one, but only its basic outline is necessary to comprehend the claims pressed on appeal. Michael Palmer presided over an organization that imported large amounts of cocaine from New York City and distributed the cocaine in northeast Washington, D.C. The other defendants played various supporting roles in the organization. Their conduct gave rise to convictions under 21 U.S.C. § 861 (formerly section 845b) on charges of drug distribution and of using juveniles (persons under the age of 18) for drug distribution. The kingpin, Palmer, was also convicted of running a Continuing Criminal Enterprise (CCE) under 21 U.S.C. § 848 because of the size and scope of the drug distribution operation, which involved many "runners," couriers, lookouts, and other helpers.

The government secured additional convictions grounded in the defendants' use of weapons. Although most of these counts were based on the usual pattern of employing firearms to intimidate the competition and to protect the operation against the police, some counts were based on the defendants' arrangement to swap drugs for guns. An acquaintance of theirs had provided weapons in exchange for drugs on a number of occasions. He subsequently became a government informant, and the next time the defendants asked him to provide guns for drugs, he set up the transaction monitored by federal agents. When Smith and Harris tendered drugs to the informant, he passed to them a gym bag containing ten guns, including a MAC–10, a favorite of drug dealers. The agents pounced as Harris and Smith were leaving the parking lot where the exchange was consummated, carrying the gym bag with them. Smith was arrested immediately, and the bag with the guns was recovered, while Harris was arrested somewhat later. This transaction led to charges based on possession and use of firearms "during and in relation" to a drug distribution offense under 18 U.S.C. § 924(c) and on possession of an automatic weapon without a permit under 26 U.S.C. § 5861(d).

In addition to several counts of drug distribution and several counts of use of firearms in relation to drug distribution offenses, the defendants were convicted of a conspiracy to distribute drugs and of a conspiracy to use firearms during and in relation to their drug trafficking offenses under 21 U.S.C. § 846 and 18 U.S.C. § 371, respectively. The multiple substantive counts on both the drug and gun offenses served as predicate acts for the conspiracies.

The government also introduced evidence of acts of armed violence by which the defendants attempted to protect their "turf" against competitors. Among other acts of violence, they assaulted Anthony Chung, one of their sellers who failed to pay for cocaine that he was given to sell, and held him for several days in an abandoned apartment. These acts did not lead to convictions but were taken into account by the district court at sentencing in the calculation of the offense levels.

---

* Justice Thomas was a judge on this court when this case was briefed and argued, and is a designated Circuit Justice of this Circuit on the date of this decision. *See* 28 U.S.C. §§ 42, 43(b).

## II.

■ All five appellants argue that the indictment was defective on multiplicity grounds in that Count 1, which charged a conspiracy to distribute cocaine and cocaine base (crack) under 21 U.S.C. § 846, and Count 3, which charged a conspiracy to carry and use firearms during and in relation to a drug trafficking offense under 18 U.S.C. §§ 371, 924(c), are substantially identical because there was only one alleged conspiracy. An indictment is multiplicious, and thereby defective, if a single offense is alleged in a number of counts, unfairly increasing a defendant's exposure to criminal sanctions. *See United States v. Israelski*, 597 F.2d 22, 24 (2d Cir.1979). We reject appellants' claim.

■ As an initial matter, we note that four of the five appellants received concurrent sentences on Counts 1 and 3; only Johnson received consecutive sentences, so only he could arguably be harmed by the alleged multiplicity. In any event, appellants did not use the term "multiplicity" until they filed their appeal and did not even allude to such an objection prior to a motion they made midway through the trial. Under the Federal Rules of Criminal Procedure, "objections based on defects in the indictment or information" must be raised before trial. FED.R.CRIM.P. 12(b)(2). The government contends that appellants' multiplicity challenge comes too late. The Supreme Court has said that "the necessary effect of the congressional adoption of Rule 12(b)(2) is to provide that a claim once waived pursuant to that Rule may not later be resurrected ... in the absence of the showing of 'cause' which that Rule requires." *Davis v. United States*, 411 U.S. 233, 242, 93 S.Ct. 1577, 1582–83, 36 L.Ed.2d 216 (1973).

Appellants claim, however, that a multiplicity objection is not included within the defects contemplated by Rule 12(b)(2), because it is a defect in the sentencing, not in the indictment. On that issue we encounter a circuit conflict. The majority of courts of appeals hold that if the multiplicity objection could have been raised based on the indictment, Rule 12(b)(2) applies. *See United States v. Griffin*, 765 F.2d 677, 680–82 (7th Cir.1985); *United States v. Price*, 763 F.2d 640, 643 (4th Cir.1985); *United States v. Herzog*, 644 F.2d 713, 716 (8th Cir.), *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981); *United States v. Alessi*, 638 F.2d 466, 476 (2d Cir.1980); *United States v. Sheehy*, 541 F.2d 123, 130 (1st Cir.1976). *But see United States v. Bradsby*, 628 F.2d 901, 905–06 (5th Cir.1980); *United States v. Rosenbarger*, 536 F.2d 715, 721–22 (6th Cir.1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977).[1]

We think the majority has much the better side of this dispute. The purpose of the rule is to compel defendants to object to technical defects in the indictment early enough to allow the district court to focus on their pretrial objections and, of course, to permit the prosecution to accommodate meritorious challenges, and to do so without disrupting an ongoing trial. As the Supreme Court has said:

> If [Rule 12(b)(2)] time limits are followed, inquiry into an alleged defect may be concluded and, if necessary, cured before the court, the witnesses, and the parties have gone to the burden and expense of a trial. If defendants were allowed to flout its time limitations, on the other hand, there would be little incentive to comply with its terms when a successful attack might simply result in a new indictment prior to trial. Strong tactical considerations would militate in favor of delaying the raising of the claim in hopes of an acquittal, with the thought that if those hopes did not materialize, the claim could be used to upset an otherwise valid conviction at a time when reprosecution might well be difficult.

*Davis*, 411 U.S. at 241, 93 S.Ct. at 1582. A claim of multiplicity, at least in the typical

---

1. The minority would "cure" a multiplicity problem by setting aside some counts on appeal even though the issue was not raised below. We reject that approach, because it interprets Rule 12(b)(2) to apply only to objections to the entire indictment, rather than to specific "defects in the indictment," as the rule itself plainly states.

case where the defect appears on the face of the indictment, falls clearly within the letter and spirit of the rule.[2]

■ Alternatively, even if appellants were permitted to make their challenge now, we conclude that there is no merit to it, as is clear from examination of the leading Supreme Court case on the issue, *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). The Court held in *Albernaz* that if two specific conspiracy provisions of the criminal code are predicated on two different substantive offenses that standing by themselves do not violate the traditional *Blockburger* test,[3] then the resulting separate conspiracy convictions are not multiplicious. *See id.* at 337–41, 101 S.Ct. at 1141–43. Appellants do not argue that the underlying substantive offenses of distribution (21 U.S.C. § 841(a)) and use of firearms in relation to a drug trafficking offense (18 U.S.C. § 924(c)) violate *Blockburger*. Instead, they insist that they have entered into only one agreement that gave rise to two conspiracies and that convictions on two separate counts for one agreement cannot stand. Appellants' argument is predicated on their assertion that *Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942), allows only one prosecution for any conspiracy arising out of a single unlawful agreement. In *Braverman,* however, the conspiratorial agreement violated only one statute, although the agreement had many unlawful objectives.

The more relevant case is *Albernaz,* and the only arguable difference between the instant case and *Albernaz* is the type of conspiracy charged. The two distinct counts charged in *Albernaz* were premised on two statutes punishing specific types of conspiracies, namely "conspiracy to import marihuana (Count I), in violation of 21 U.S.C. § 963, and conspiracy to distribute marihuana (Count II), in violation of 21 U.S.C. § 846." *Albernaz,* 450 U.S. at 334, 101 S.Ct. at 1140. In our case, violations of one specific conspiracy provision (21 U.S.C. § 846) and one general conspiracy provision (18 U.S.C. § 371) are charged,[4] instead of two specific conspiracies as in *Albernaz,* but such distinctions have no significance for multiplicity analysis. *See United States v. Lanier,* 920 F.2d 887, 892–95 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 208, 116 L.Ed.2d 166 (1991). The Supreme Court explicitly stated that if proof of each conspiracy is distinguishable and independent (as it is here because each conspiracy charged had distinct elements besides the agreement), then two separate statutory offenses are implicated. *See Albernaz,* 450 U.S. at 338–39, 101 S.Ct. at 1142. Even accepting *arguendo* that two conspiracy counts arising under the same general conspiracy statute might be multiplicious because there is only one agreement and a violation of only one statute is charged, here we have two separate statutory provisions violated by one agreement,

2. We further reject appellants' argument that we can entertain their challenge because multiplicity objections are grounded in the double jeopardy clause and are, therefore, somehow jurisdictional. It is well established that the absence of objection constitutes a waiver of the double jeopardy defense. *See United States v. Bascaro,* 742 F.2d 1335, 1365 (11th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985); *cf. Peretz v. United States,* —— U.S. ——, 111 S.Ct. 2661, 2669, 115 L.Ed.2d 808 (1991) (stating that the basic rights of criminal defendants are waivable).

3. Under *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), "[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires

proof of a fact which the other does not." *Id.* at 304, 52 S.Ct. at 182. The Supreme Court recently added a second inquiry to the *Blockburger* test that is not applicable here. *See Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 2093, 109 L.Ed.2d 548 (1990) ("[T]he Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in the prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted.").

4. "General conspiracy charge" refers to the charge based on the U.S.Code provision punishing the conspiracy to commit any unlawful act, and "specific conspiracy charge" refers to the U.S.Code provision punishing agreements to violate specific provisions of the Code, such as the drug distribution sections.

and therefore it is clear that Congress intended separate punishments for violators of both. *See United States v. Nakashian,* 820 F.2d 549, 552–54 (2d Cir.), *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987); *Timberlake v. United States,* 767 F.2d 1479, 1481 (10th Cir.1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 882, 88 L.Ed.2d 918 (1986).

### III.

Among other crimes, Michael Palmer was convicted of participating in the drug conspiracy charged in Count 1 of the indictment, *see* 21 U.S.C. § 846, and of heading the CCE charged in Count 2, *see id.* § 848. Palmer makes three challenges to the district court's jury instructions on the latter offense. First, he argues that the district court erred in telling the jury that it could predicate a CCE violation upon a section 846 conspiracy. Second, he argues that the district court should have required the jury to identify each of the five underlings involved in the criminal enterprise. Finally, he argues that the district court should have instructed the jury to consider only the quantity of drugs involved in the enterprise after November 1, 1987. We reject all three arguments.

### A.

■ A person has engaged in a CCE under 21 U.S.C. § 848(c)[5] if "(1) [he committed] a predicate offense violating a spec-

ified drug law (2) as part of a 'continuing series' of drug violations (3) that occurred while [he] was acting in concert with five or more other people (4) to whom [he] occupied the position of an organizer or manager and from which series [he] (5) obtained substantial income or resources." *United States v. Markowski,* 772 F.2d 358, 360–61 (7th Cir.1985), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986). The principal administrator of a CCE involving 300 times the quantity of drugs set out in 21 U.S.C. § 841(b)(1)(B) must receive a sentence of life in prison without parole. *See id.* § 848(b).[6] Section 841(b)(1)(B)(iii) punishes distribution offenses involving at least five grams of crack; 300 times that amount is at least 1500 grams of crack.

Instructing the jury on the elements of the CCE violation, the district court explained, in relevant part:

If you determine that Palmer is guilty of count 1, you must then determine whether the government has proved beyond a reasonable doubt the second element of count 2, namely, whether the violation of count 1 was a part of a continuing series of violations of the federal drug laws by the defendant Palmer.

I charge you that a "series" means "three or more," and that the term "continuing" means "enduring, subsisting for a definite period or intended to cover or apply to successive, similar occurrences."

---

5. Section 848(c) states in full:

   For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—

   (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

   (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

   (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

   (B) from which such person obtains substantial income or resources.

   21 U.S.C. § 848(c).

6. Section 848(b) states in full:

   Any person who engages in a continuing criminal enterprise shall be imprisoned for

life and fined in accordance with subsection (a) of this section, if—

   (1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and

   (2)(A) the violation referred to in subsection (d)(1) of this section involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title, or

   (B) the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in section 841(b)(1)(B) of this title.

   21 U.S.C. § 848(b).

To find Palmer guilty of count 2, you must find beyond a reasonable doubt that he committed the offense charged in count 1, the conspiracy, plus two or more additional violations of the federal drug laws, which must be taken from any of the violations charged in counts 4, 5, 8, 9, 12, 18 or 20 of the indictment, or any of the overt acts in paragraphs 10, 11, 25, 26, 29, or 31 in count 1 of the indictment, over a definite period of time with a single or similar purpose.

The jury found that Palmer had participated in the drug conspiracy and committed other substantive offenses. It also convicted him as the head of a CCE involving more than 1500 grams of crack. The district court therefore sentenced Palmer to the life term that section 848(b) mandates.

Palmer argues that the jury would not have found that his CCE offense involved the minimum quantity of drugs necessary to trigger section 848(b) had it not improperly counted the drug conspiracy as one of the three offenses making up the "continuing series of violations." 21 U.S.C. § 848(c)(2). He points to the requirement that a person engaging in a CCE act "in concert with five or more other persons." *Id.* § 848(c)(2)(A). "Acting in concert" is coterminous with conspiring, according to Palmer; allowing a conspiracy violation to serve as a predicate for a CCE violation therefore leads to the "addled proposition that the [CCE] is 'a crime to commit a conspiracy in concert with other people.' " Reply Brief of Appellant Palmer at 4 (citation omitted). We are not persuaded by this contention.

Although this court has not yet considered whether a section 846 conspiracy can serve as one of the three predicate offenses for a section 848 CCE violation, eight different circuits have held that it can.[7] As the Second Circuit explained in *United States v. Young*, 745 F.2d 733 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985):

> [T]he statutory language is unambiguous. [Section 848(c)(1) ] provides that *any* felony violation of Subchapters I and II of Chapter 13 of Title 21 is an eligible predicate, and nothing in the text of either § 848 or § 846 suggests that although a § 846 conspiracy is such a felony it does not qualify as a predicate for a § 848 charge. The reference in § 848 to "any" felony violation of the narcotics laws does not mean "any felony violation except a § 846 conspiracy."

*Id.* at 750. Finding nothing in the legislative history or statutory policies to contradict the plain language of section 848, that court was "unwilling to read ... a limitation into the statute." *Id.* at 751.

Palmer rests his argument on *United States v. Baker*, 905 F.2d 1100 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990). In *Baker*, the Seventh Circuit rejected the then-unanimous view that a section 846 conspiracy is a valid CCE predicate. The court reasoned that Congress did not intend a drug conspiracy, which is present every time the "acting in concert" element has been met, also to count towards the "continuing series" element. *See id.* at 1103. However, the Seventh Circuit also held that a "series" may consist of only two predicate offenses. *See id.* at 1103–04. *Baker* and *Young* are thus identical "in result, although not in exposition," on the question whether any given person has engaged in a CCE within the meaning of section 848(c). *Id.* at 1105.

The expository difference—whether the CCE "series" consists of at least two predicates not including section 846 or at least

---

7. *See United States v. Hernandez–Escarsega*, 886 F.2d 1560, 1571 (9th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990); *United States v. Hall*, 843 F.2d 408, 411 (10th Cir.1988); *United States v. Fernandez*, 822 F.2d 382, 385 (3d Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 391 (1987); *United States v. Ricks*, 802 F.2d 731, 737 (4th Cir.), *cert. denied*, 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 705 (1986); *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *United States v. Schuster*, 769 F.2d 337, 345 (6th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1210, 89 L.Ed.2d 322 (1986); *United States v. Young*, 745 F.2d 733, 751–52 (2d Cir. 1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United States v. Middleton*, 673 F.2d 31, 33 (1st Cir.1982).

three predicates including section 846—becomes significant for purposes of determining the applicable penalty, because the greater the number of predicates in the series (and therefore the greater the likelihood that the requisite dollar or drug amount is involved), the more likely that a mandatory life sentence will apply. *See* 21 U.S.C. § 848(b) (mandating life sentences where at least 300 times the prohibited quantity of drugs is involved or the enterprise received ten million dollars in gross receipts during any twelve month period). The question, then, boils down to whether Congress would have wanted CCE perpetrators to be responsible for all drugs within the scope of their agreement to "act[ ] in concert," or only for those drugs involved in their underlying substantive offenses.

■ With the issue thus identified, we join the seven other circuits in agreement with *Young.* "When we find the terms of a statute unambiguous, judicial inquiry is complete, except 'in "rare and exceptional circumstances." ' " *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981) (citations omitted). We agree with the Second Circuit that the terms of section 848(c) are unambiguous: "[t]he reference in § 848 to 'any' felony violation of the narcotics laws does not mean 'any felony violation except a § 846 conspiracy.' " *Young,* 745 F.2d at 750. Moreover, we disagree with the Seventh Circuit that the straightforward application of those terms produces the kind of absurd results that might warrant a court's refusal to enforce a statute as written. As a general matter, one who conspires to distribute a certain amount of drugs is punished as if he had actually distributed that same amount. *See* 21 U.S.C. § 846. Contrasted with *Baker,* the approach in *Young* merely extends the same principle into the CCE context: if distributing a cer-

tain amount of drugs would trigger heightened punishment under section 848(b), then conspiring to distribute that same amount should do so as well. Finding nothing "exceptional" about that extension, we decline Palmer's invitation to follow *Baker.*[8]

## B.

■ Palmer next challenges the jury instructions on the third element of the CCE offense, which requires action in concert with five or more persons. The district court instructed the jury that it must unanimously agree on which five (or more) persons belonged to the enterprise, but the court did not require the jury to disclose the identities of those persons. Palmer contends that the latter omission violated the Sixth Amendment, under which a criminal defendant cannot be convicted in federal court absent a unanimous verdict. *See, e.g., United States v. Essex,* 734 F.2d 832, 840–41 (D.C.Cir.1984). The government responds that because neither the CCE statute nor the Sixth Amendment requires such particularized agreement among jurors, much less disclosure, the district court committed error in Palmer's favor. We agree with the government.

■ Commission of a CCE offense requires concerted action with "five or more other persons." 21 U.S.C. § 848(c)(2)(A). Construing this language, six circuits have held that "[t]he CCE statute is directed against all enterprises of a certain size; the identity of those involved is irrelevant." *United States v. Markowski,* 772 F.2d 358, 364 (7th Cir.1985), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986); *accord United States v. Moorman,* 944 F.2d 801 (11th Cir.1991) (per curiam); *United States v. English,* 925 F.2d 154, 159 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991); *United*

---

8. Palmer briefly raises a double jeopardy challenge. He contends that because a section 846 conspiracy is a lesser included offense of a section 848 CCE, the Double Jeopardy Clause prohibits the government from prosecuting the latter offense after securing a conviction on the former. Palmer's successive prosecution claim in this case is frivolous, however, because the government secured both the conspiracy and the CCE convictions during the same prosecution. *See, e.g., Ohio v. Johnson,* 467 U.S. 493, 500, 104 S.Ct. 2536, 2541, 81 L.Ed.2d 425 (1984) ("While the Double Jeopardy Clause may protect a defendant against cumulative punishments for convictions on the same offense, the Clause does not prohibit the State from prosecuting [a defendant] for such multiple offenses in a single prosecution.").

*States v. Linn,* 889 F.2d 1369, 1374 (5th Cir.1989), *cert. denied,* — U.S. —, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990); *United States v. Jackson,* 879 F.2d 85, 88 (3d Cir. 1989); *United States v. Tarvers,* 833 F.2d 1068, 1074 (1st Cir.1987). We too conclude that the statute makes relevant only the number, but not the identities, of the defendant's co-conspirators. Because each member of the jury found that Palmer had acted in concert with "five or more persons," the jury unanimously agreed that he had committed the offense as Congress defined it.

Palmer contends that the Sixth Amendment requires more. In insisting that the jury was required to agree not just *whether* he committed the CCE offense, but also *how* he did so (for example, by acting in concert with Harris plus four others, as opposed to Wyche plus four others), Palmer asserts, in effect, that the Sixth Amendment limits the range of conduct that the legislature may define as a single offense. He bases his argument on a line of circuit court authority tracing back to *United States v. Gipson,* 553 F.2d 453 (5th Cir. 1977), in which the Fifth Circuit held that a federal jury must unanimously agree on "just what a defendant did," at least to the extent that the competing possibilities fall within "distinct conceptual groupings." *Id.* at 457-48.

Palmer's argument, we believe, is clearly foreclosed by the Supreme Court's recent decision in *Schad v. Arizona,* — U.S. —, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion). There, the Court affirmed a conviction under an Arizona statute that defines first-degree murder as a single offense consisting of either premeditated murder or felony murder. The defendant had argued that the Sixth Amendment forbade the jury to convict him unless it first agreed on one of the two theories underlying the offense. In rejecting the defendant's argument, the Court departed from *Gipson's* analytical framework in two significant respects.

First, a majority of Justices concluded that it is the Due Process Clause, not the Sixth Amendment unanimity requirement,[9] that prevents legislatures from defining particular offenses too broadly. As to the latter, Justice Souter's plurality opinion asserted that " 'there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict,' " *id.* at 2497 (quoting *McKoy v. North Carolina,* 494 U.S. 433, 449, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (Blackmun, J., concurring)), and Justice Scalia's concurrence agreed that "it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission," *id.* at 2506 (Scalia, J., concurring in part and concurring in the judgment). The Court concluded that because each juror agreed that the defendant had committed the offense of first-degree murder—the sole proposition about which the jury would have had to be unanimous—a requirement of jury unanimity, even if applicable, would have been satisfied. *See Schad,* 111 S.Ct. at 2496; *see also id.* at 2505-07 (Scalia, J., concurring in part and concurring in the judgment).

Second, in upholding the Arizona statute against due process attack, the Court rejected *Gipson's* "distinct conceptual groupings" test. The Court agreed that some alternative courses of conduct are so different that the Constitution prohibits them from being defined as alternative means of committing a single offense. *See Schad,* 111 S.Ct. at 2497-98 ("[N]othing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of 'Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction."); *id.* at 2506 (Scalia, J., concurring in part and

---

9. Because of its disposition, the Court found it unnecessary to reach petitioner's argument that the Sixth Amendment's unanimity requirement, which is inapplicable to state criminal trials generally, *see Apodaca v. Oregon,* 406 U.S. 404,

410–12, 92 S.Ct. 1628, 1632–33, 32 L.Ed.2d 184 (1972) (plurality opinion); *id.* at 414 (Powell, J., concurring in the judgment), should apply to state capital trials. *See Schad,* 111 S.Ct. at 2496.

concurring in the judgment) ("[O]ne can conceive of novel 'umbrella' crimes (a felony consisting of either robbery or failure to file a tax return) where permitting a 6–6 verdict would seem contrary to due process."). However, the Court concluded that the "distinct conceptual groupings" test was "too conclusory" to provide meaningful guidance for distinguishing permissible alternatives from impermissible ones. *See Schad*, 111 S.Ct. at 2499.

The plurality and the concurrence disagreed somewhat on the appropriate due process test. In giving content to its ultimate requirement of "fundamental fairness," the plurality looked to "history and current practice" as "significant" indicators of that fairness. *Id.* at 2500–03. It also required examination of whether the alternatives under consideration "reasonably reflect notions of equivalent blameworthiness or culpability." *Id.* at 2503.[10] Justice Scalia argued that historical practice was not only significant, but dispositive. *See id.* at 2507 (Scalia, J., concurring in part and concurring in the judgment).

*Schad* therefore forecloses the Sixth Amendment hook for Palmer's argument that the jury was required to agree unanimously on the identities of his CCE co-conspirators. Just as Schad's jury "was unanimous in deciding that the State had proved what, under state law, it had to prove," *Schad*, 111 S.Ct. at 2496, so Palmer's jury was unanimous in deciding that the government here proved what it had to prove—that Palmer had acted in concert with "five or more persons." Palmer never made a due process argument. However, at the time of oral argument, *Gipson* remained good law in no fewer than four different circuits,[11] and neither party in *Schad* had attacked *Gipson*'s reliance on the Sixth Amendment. Because Palmer therefore had no reasonable way of anticipating how properly to frame his argument under current law, we review his claim as if he had brought a due process challenge.

We have no doubt that the CCE statute easily survives both Justice Souter's and Justice Scalia's due process tests. First, the statute's five-person requirement is nothing like the "umbrella" crimes that concerned the five Justices. *See id.* at 2497–98; *id.* at 2506 (Scalia, J., concurring in part and concurring in the judgment). Nor does the five-person requirement violate any historical or contemporary notions of fundamental fairness. Every court of appeals that has addressed the issue has held that the Constitution does not require jurors to reach agreement on the identities of the CCE co-conspirators.[12] In this respect, the law of CCE tracks the law of conspiracy, which generally has not required jurors to identify the defendant's co-conspirators.[13] We also think it beyond

**10.** Although *Schad* addressed the permissible breadth of a *mens rea* requirement, the plurality made clear that the same analysis would apply to a statutory *actus reus* requirement. *See id.* at 2497.

**11.** *See United States v. Duncan*, 850 F.2d 1104, 1110–13 (6th Cir.1988) (following *Gipson*), *cert. denied*, 493 U.S. 1025, 110 S.Ct. 732, 107 L.Ed.2d 751 (1990); *accord United States v. Beros*, 833 F.2d 455, 460–62 (3d Cir.1987); *United States v. Peterson*, 768 F.2d 64, 66–68 (2d Cir.), *cert. denied*, 474 U.S. 923, 106 S.Ct. 257, 88 L.Ed.2d 264 (1985); *see also United States v. North*, 910 F.2d 843, 874–76 (D.C.Cir.1990), *vacated in pertinent part on other grounds*, 920 F.2d 940, 950–51 (D.C.Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

**12.** *See Moorman*, 944 F.2d at 802–03; *English*, 925 F.2d at 159; *Linn*, 889 F.2d at 1374; *Jackson*, 879 F.2d at 90; *Tarvers*, 833 F.2d at 1075; *Markowski*, 772 F.2d at 364.

**13.** *See Rogers v. United States*, 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951) ("Of course, at least two persons are required to constitute a conspiracy, but the identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown." (citing, among other cases, *Pomerantz v. United States*, 51 F.2d 911, 913 (3d Cir.1931); *Rosenthal v. United States*, 45 F.2d 1000, 1003 (8th Cir.1930); *Didenti v. United States*, 44 F.2d 537, 538 (9th Cir.1930); *McDonald v. United States*, 9 F.2d 506, 507 (8th Cir.1925); *Grove v. United States*, 3 F.2d 965, 967 (4th Cir.), *cert. denied*, 268 U.S. 691, 45 S.Ct. 511, 69 L.Ed. 1159 (1925); *Donegan v. United States*, 287 F. 641, 648 (2d Cir.1922), *cert. denied*, 260 U.S. 751, 43 S.Ct. 251, 67 L.Ed. 495 (1923); *Browne v. United States*, 145 F. 1, 13 (2d Cir.1905), *cert. denied*, 200 U.S. 618, 26 S.Ct. 755, 50 L.Ed. 623 (1906))); *see also Jackson*, 879 F.2d at 88 (finding no authority for the proposition that jurors must identify co-conspirators); *United States v. Raf-*

dispute that acting in concert with one group of five persons is the moral and practical equivalent of acting in concert with another group of five. Thus, under *Schad*, the Due Process Clause permits different people to serve as "alternative means" of satisfying the CCE five-person requirement.

## C.

██ Finally, Palmer argues that although his enterprise began in January 1987, the district court should have instructed the jury to consider only the quantity of drugs involved in the enterprise after November 1, 1987. Because Palmer did not raise this argument in the district court, we review the court's instruction only for plain error. We find no error at all.

Palmer's life sentence was based on his leading a CCE involving "at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of [title 21]." 21 U.S.C. § 848(b)(2)(A). The jury had attributed to his enterprise over 1500 grams of crack, more than 300 times the five-gram amount set out in section 841(b)(1)(B)(iii). Both section 848(b) and section 841(b)(1)(B) were enacted as part of the Anti–Drug Abuse Act of 1986 (ADAA), Pub.L. No. 99–570, 100 Stat. 3207, which President Reagan signed into law on October 27, 1986. Palmer argues that although section 848(b) became effective immediately, section 841(b)(1)(B), which defines the drug amounts necessary to trigger a mandatory life sentence, did not become effective until November 1, 1987. Therefore, he concludes, the court erred insofar as it failed to require the jury to determine whether his enterprise involved at least 1500 grams of crack *after* November 1, 1987. We reject the first step in Palmer's argument.

Section 841(b)(1)(B) was enacted by section 1002 of the ADAA. That section did not have an express effective date. Sec-

tion 1004 of the ADAA, on the other hand, stated that "[t]he amendments made by this section shall take effect on the date of the taking effect of [18 U.S.C. § 3583]," which occurred on November 1, 1987.[14] Palmer interprets the words "this section" in section 1004(b) to include section 1002. Both this court and the Supreme Court, however, have already rejected Palmer's interpretation. In *United States v. Brundage*, 903 F.2d 837 (D.C.Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991), we observed that "ADAA section 1004(b) by its plain meaning applies only to section 1004(a)." *Id.* at 843. Therefore, we concluded, "ADAA section 1002 became effective in its entirety when it was enacted on October 27, 1986." *Id.* In *Gozlon–Peretz v. United States*, —— U.S. ——, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991), the Supreme Court endorsed our conclusion. *See id.* at 847–48 & n. 9. Because Palmer's enterprise did not begin until January 1987, more than two months after section 1002 became effective, the jury's finding that the enterprise involved over 1500 grams of crack necessarily activated section 848(b). His life sentence stands.

## IV.

Appellants Harris and Smith challenge their convictions under 26 U.S.C. § 5861(d) and 18 U.S.C. § 924(c). Section 5861(d) proscribes the possession of certain unregistered firearms, including machine guns, *see* 26 U.S.C. § 5845(a)(6), and section 924(c) makes it a separate offense to use a firearm in connection with a drug trafficking offense, increasing the penalty drastically if the weapon is a machine gun. A machine gun is a gun capable of firing automatically, that is, of firing several bullets with one pull on the trigger. *See* 26 U.S.C. § 5845(b).

---

*fone,* 693 F.2d 1343, 1348 (11th Cir.1982) (same), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2094, 77 L.Ed.2d 303 (1983).

**14.** The original effective date for 18 U.S.C. § 3583 was November 1, 1986. *See* Sentencing

Reform Act of 1984, Pub.L. No. 98–473, § 235(a)(1), 98 Stat. 1837, 2031. That date was later extended to November 1, 1987. *See* Sentencing Reform Amendments Act of 1985, Pub.L. No. 99–217, § 4, 99 Stat. 1728, 1728.

Both convictions are based on the trade of drugs for weapons between the informant and Harris and Smith, in which a MAC–10, a machine gun within the definition of section 924(c) and a firearm within the meaning of section 5861(d), was passed to the duo. The jury was not charged that it had to find that appellants knew they were receiving a proscribed firearm—in particular, a machine gun. Rather, the instructions in substance allowed the jury to convict under both statutes if it found that Harris and Smith knowingly possessed a weapon and that the weapon was in fact a machine gun. Harris and Smith objected to the instructions and claim on appeal that the government must prove that they knew of the gun's automatic firing capability, which made it a machine gun (for section 924(c)) and a firearm (for section 5861(d)) under the statutory definitions.

█ Appellants' claim is primarily a statutory one, but they also argue that the Due Process Clause requires the government to prove knowledge of the weapon's proscribed nature as an automatic. We easily reject the latter challenge because there is no constitutional requirement that every element of an offense dealing with highly dangerous devices or substances have *scienter.* "The power of the legislature to declare an offense, and to exclude the elements of knowledge and due diligence from any inquiry as to its commission, cannot, we think, be questioned." *Chicago, B. & Q. Ry. v. United States,* 220 U.S. 559, 578, 31 S.Ct. 612, 617, 55 L.Ed. 582 (1911). We therefore turn to the language of the statutes, using the usual tools of statutory analysis, to determine whether Congress intended to require knowledge of the gun's characteristics.

It is traditional to assume that a criminal statute—unless Congress manifests a contrary intention—requires the government to show the defendant's *mens rea:*

The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.

*Morissette v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952). Accordingly, we said recently: "absent evidence of a contrary legislative intent, courts should presume *mens rea* is required." *United States v. Nofziger,* 878 F.2d 442, 452 (D.C.Cir.), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 564, 107 L.Ed.2d 559 (1989). In addition to this presumption in favor of *mens rea,* appellants' argument is supported by another canon of statutory construction, the rule of lenity: " 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' " *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (quoting *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971)). If, "[a]fter 'seiz[ing] every thing from which aid can be derived,' we are left with an ambiguous statute," *id.* (quoting *United States v. Fisher,* 6 U.S. (2 Cranch) 230 (1805)), we must construe the statute against the government. *See Nofziger,* 878 F.2d at 452.

### A.

█ Section 924(c) states in relevant part: "Whoever, during and in relation to any crime of violence or drug trafficking crime ..., uses or carries a firearm, shall [be imprisoned for five years], ... and if the firearm is a machinegun, ... to imprisonment for thirty years." 18 U.S.C. § 924(c)(1). The language of the section is silent as to knowledge regarding the automatic firing capability of the weapon. Other *indicia,* however, namely the structure of section 924(c) and the function of *scienter* in it, suggest to us a congressional intent to apply strict liability to this element of the crime.

Consistent with the presumption of *mens rea* in criminal statutes, we assume that section 924(c) is violated only if the government proves that the defendant engaged in drug trafficking and intentionally used firearms in the commission of a drug trafficking crime. The defendant's knowledge that the objects used to facilitate the crime

are "firearms" must be proven and charged to the jury, as it was in this case. Deliberate culpable conduct is therefore required as to the essential elements of the crime—the commission of the predicate offense and the use of a firearm in its execution—before the issue of sentence enhancement for use of a machine gun arises.

Harris and Smith argue, however, that, in light of the enhanced penalties involved, if a machine gun was used the government must show that the defendant knew the precise nature of the weapon and not merely that he knowingly used a weapon in relation to a drug distribution offense. The difficulty we see in appellants' position is that, assuming that the essential elements of the crime (drug trafficking and use of a firearm) already require a showing of *mens rea,* there does not seem to be a significant difference in *mens rea* between a defendant who commits a drug crime using a pistol and one who commits the same crime using a machine gun; the act is different, but the mental state is equally blameworthy. We are in neither case potentially confronted with an altar boy making an innocent mistake. This case is similar to those involving arguments that criminal penalties cannot be enhanced based on possession of different kinds of illegal substances (drugs) without the government showing that the defendant knew the exact nature of a given illegal substance. That argument, correctly in our view, has been rejected by other circuits. *See, e.g., United States v. Gonzalez,* 700 F.2d 196, 200 (5th Cir.1983) ("[T]he government is not required to prove that a defendant knew the exact nature of the substance with which he was dealing; it is sufficient that he was aware that he possessed some controlled substance."); *accord United States v. Kairouz,* 751 F.2d 467, 468 n. 3 (1st Cir. 1985) (citing additional cases); *cf. United States v. Lopez–Martinez,* 725 F.2d 471, 474 (9th Cir.1984) (discussing cases holding that to be guilty of grand theft, as opposed to petty theft, the defendant need not know the value of the property stolen). The jury found (pursuant to the district court's instructions) that both Harris and Smith knowingly or intentionally possessed a firearm, and that they did so intentionally to facilitate a drug trafficking crime. Neither challenges the first finding, and we reject their challenge to the second in Part V below. We therefore conclude that appellants had the requisite *mens rea* under section 924(c).[15]

**B.**

Section 5861(d) states that "[i]t shall be unlawful for any person ... to receive or possess a firearm which is not registered to him." 26 U.S.C. § 5861(d). "Firearm" for the purposes of section 5861(d) includes "a machinegun" along with certain other types of weaponry, but it excludes the more common types of guns such as most ordinary rifles, shotguns, and handguns. *Id.* § 5845(a). In prosecutions under section 5861(d), unlike those under section 924(c), the defendant is not necessarily someone who has already been proven to have engaged knowingly in criminal behavior with the very gun in question. Instead, it might be any person who has come into the possession of an automatic weapon, and who quite possibly has no reason to be aware that the weapon is a "firearm" within the meaning of the statute.

The government argues that it need only show (and therefore the jury need not be charged to find more) that the defendant knew he possessed some kind of gun, not necessarily a proscribed "firearm" within the meaning of section 5861(d). Presumably, then, if the defendant thought the object he possessed was not even a gun, if

---

**15.** Unrebutted testimony indicated that Harris actually handled the weapon and that Palmer—the leader of the enterprise to which both Harris and Smith belonged—had affirmatively sought machine guns from Carroll, the government informant. We are thus not presented with a situation in which the government, as part of a "sting," foists on duped receivers un- wanted automatic weapons. Such a case would rank with one in which the government, after causing an individual to believe that a sealed bag he is handed contains marijuana, then prosecutes him for possessing heroin. The drug possession cases cited above did not involve sting operations.

he thought it a carpenter's tool or a piece of fishing equipment or a cigarette lighter, even the government would concede that the defendant would not have violated the section. But, as we put to government counsel at oral argument, if someone utterly unfamiliar with guns should be given what he was told was an antique shotgun, and it turned out to be an Uzi submachine gun, the government insists that this person has violated section 5861(d) and is guilty of a felony. The government reasons that everyone is on notice that guns of any kind are "dangerous instrumentalities," and therefore it is the defendant's burden to determine whether the gun in question is a "firearm" proscribed by section 5861(d).

The government relies primarily on *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), for this proposition. The Supreme Court there held that knowledge that a hand grenade was unregistered was not required for conviction under section 5861(d), saying "one would hardly be surprised to learn that possession of hand grenades is not an innocent act." *Id.* at 609, 91 S.Ct. at 1118. *Freed* did not address the question similar to the one raised by our case: suppose the government did not show that the defendant knew the object he possessed was in fact a hand grenade. Surely it is not inconceivable that someone ignorant of weaponry should come into possession of a hand grenade thinking it something entirely different— perhaps an antique projectile fired out of nineteenth-century mortar. To be sure, the Court described grenades as "highly dangerous offensive weapons," *id.*, that put a citizen on notice to " 'ascertain at his peril' " whether possession is regulated, just as that was required of persons dealing in drugs in *United States v. Balint*, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922). *Freed*, 401 U.S. at 609, 91 S.Ct. at 1119–20 (quoting *Balint*, 258 U.S. at 254, 42 S.Ct. at 303). But this proposition necessarily assumes that the defendant knew he possessed a grenade. *See id.* at 612, 91 S.Ct. at 1120 (Brennan, J., concurring in the judgment) ("The Government and the Court agree that the prosecutor must

prove knowing possession of the items and also knowledge that the items possessed were hand grenades."). If the defendant did not know the object's dangerous properties because he did not know what the object was, the Court's logic does not apply.

It may well be that all guns of whatever kind are dangerous, but Congress decided to require registration of only certain kinds of firearms that it thought were highly dangerous. Were we to accept the government's argument that so long as a defendant has knowledge that he possesses a gun of any type, the defendant is absolutely liable for possessing a proscribed "firearm," we would implicitly expand Congress' negative judgment concerning the possession of certain particularly dangerous guns to all guns.

The circuits are split on this issue. The government's position has been accepted in five circuits, *see United States v. Shilling*, 826 F.2d 1365, 1367–68 (4th Cir.1987), *cert. denied*, 484 U.S. 1043, 108 S.Ct. 777, 98 L.Ed.2d 863 (1988); *United States v. Gonzalez*, 719 F.2d 1516, 1522 (11th Cir.1983), *cert. denied*, 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 710 (1984); *Morgan v. United States*, 564 F.2d 803, 805 (8th Cir.1977); *United States v. Ranney*, 524 F.2d 830, 832 (7th Cir.1975), *cert. denied*, 424 U.S. 922, 96 S.Ct. 1130, 47 L.Ed.2d 330 (1976); *United States v. DeBartolo*, 482 F.2d 312, 316 (1st Cir.1973), and rejected in three, *see United States v. Anderson*, 885 F.2d 1248, 1251 (5th Cir.1989) (en banc); *United States v. Williams*, 872 F.2d 773, 777 (6th Cir.1989); *United States v. Herbert*, 698 F.2d 981, 986–87 (9th Cir.), *cert. denied*, 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983). We agree with the latter group, which, we note, includes the more recent cases.

We think the reasoning of the Fifth, Sixth, and Ninth Circuits comports better with the traditional understanding of the criminal law as punishing only truly culpable conduct. *See Liparota v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). In *Liparota* the Supreme Court reversed a conviction because

a grocery store owner's purchase of food stamps at a discount was not so obviously criminal that Congress could have been presumed to eliminate the intent requirement from the relevant statute. *See id.* at 426–27, 105 S.Ct. at 2088–89; *see also* Note, *Ignorance of the Law as an Excuse,* 86 COLUM.L.REV. 1393, 1401–02 (1986) (arguing that *Liparota* is based on the refusal to criminalize everyday behavior). The government's construction would in *Liparota* (just as it would in this case) criminalize acts completely innocuous on their face despite the actor's ignorance of the unknown facts that made his behavior illegal. "[T]he failure of Congress explicitly and unambiguously to indicate whether *mens rea* is required does not signal a departure from this background assumption of our criminal law. This construction is particularly appropriate where, as here, to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct." *Liparota,* 471 U.S. at 426, 105 S.Ct. at 2088.

We believe that if Congress, against the background of widespread lawful gun ownership, wished to criminalize the mere unregistered possession of certain types of firearms—often indistinguishable from other, non-prohibited types—it would have spoken clearly to that effect. We do not see how it can be said that Congress meant to draw the line between the individual who knowingly possesses a gun of some kind but not a firearm within the meaning of the statute and an individual who possesses a "firearm" not even realizing it is a gun. It is not necessary in this case to consider what evidence would be sufficient to establish that a defendant did have knowledge that he possessed a "firearm." *Cf. Herbert,* 698 F.2d at 986 (suggesting that visibility of certain characteristics of a firearm may be sufficient to establish knowledge). It is sufficient to reject the notion pressed on us by the government that appellants' mental state (*mens rea*) was irrelevant. Because the jury was not charged that it had to find that Harris and Smith knew they were receiving a proscribed firearm (machine gun), and the error is not alleged to be harmless, appellants' convictions on

the section 5861(d) count must be reversed. No remand for retrial is necessary in this case, however. The government concedes that there is insufficient evidence to support a conclusion that Smith knew the gun was a machine gun and that a judgment of acquittal on the section 5861(d) count should therefore be entered as to him. And while it believes that the evidence introduced at trial would have permitted a properly instructed jury to convict Harris, the government has represented that because Harris' sentence on the section 5861(d) count ran concurrently with other sentences, it will seek no retrial in his case.

## V.

■ Harris and Smith, relying on *United States v. Phelps,* 877 F.2d 28, 30 (9th Cir.1989), also challenge their convictions under section 924(c) on the ground that the guns involved were used only as a medium of exchange in a trade for drugs and not as offensive or defensive weapons. Appellants therefore argue that the guns were not used "in relation to" a drug crime. But the language of the section—"uses or carries [in relation to]"—is certainly broad enough to cover guns used in this way. The only limitation is that the guns be used "in relation" to the drug trafficking crime involved, which we think requires no more than that the guns facilitate the predicate offense in some way. *See United States v. Stewart,* 779 F.2d 538, 540 (9th Cir.1985) (Kennedy, J.), *cert. denied,* 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987). This requirement is met "[i]f the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurred." *Id.* We think that once the MAC–10 passed into appellants' hands the facilitative nexus was satisfied.

It may well be that Congress, when it drafted the language of section 924(c), had in mind a more obvious use of guns in connection with a drug crime, but the language is not so limited, nor can we imagine any reason why Congress would not have wished its language to cover this situation. Whether guns are used as the medium of exchange for drugs sold illegally or as a means to protect the transaction or dealers, their introduction into the scene of drug transactions dramatically heightens the danger to society. *See United States v. Phelps*, 895 F.2d 1281, 1287–88 (9th Cir. 1990) (Kozinski, J., dissenting from denial of rehearing *en banc*). We therefore respectfully disagree with the Ninth Circuit's decision in *Phelps* and affirm Harris and Smith's convictions under section 924(c).

## VI.

■■■ Harris, Wyche, Smith, and Johnson challenge their convictions under 21 U.S.C. § 861 (formerly section 845b) for using juveniles in drug trafficking. Section 861 states: "It shall be unlawful for any person at least 18 years of age to knowingly and intentionally ... employ, hire, use, persuade, induce, entice, or coerce, a person under 18 years of age to violate any [of the drug laws set out in 21 U.S.C. §§ 801–971]." *Id.* § 861(a)(1). In the district court, all five defendants moved for judgments of acquittal on this count, arguing that the government had failed to prove that they were at least 18 years of age, an essential element of the offense. Although the court agreed that age is an essential element of a section 861 offense, it rejected their motions. The court explained that the government had introduced sufficient evidence that Palmer was over the age of 18 and held that the remaining four defendants could be convicted under an aiding and abetting theory.

"Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). Aiding and abetting an offense consists of four elements: "(1) the specific intent to facilitate the commission of a crime by another; (2) guilty knowledge on the part of the accused; (3) that an offense was being committed by someone; and (4) that the accused assisted or participated in the commission of the offense." *United States v. Raper*, 676 F.2d 841, 849 (D.C.Cir.1982) (citations omitted). Appellants do not dispute that the government submitted sufficient proof on each of these elements. Instead, they contend that section 861 manifests Congress' intent not only to limit punishment to persons over the age of 18, but also to protect persons under 18. Convicting juveniles on an aiding and abetting theory would subvert that intent because it would result in punishment of the very class of persons whom section 861 was designed to protect. Since the government failed to prove that they were not juveniles, appellants conclude, they were not punishable under section 861.

Appellants' argument depends on two distinct assertions: first, that section 861 can effectively shield juveniles from liability under an aiding and abetting theory, and second, that the government had the burden of proving that all of the appellants were not juveniles. Assuming the first point, *arguendo*, we reject the second. We therefore affirm the convictions under section 861.

Aider and abettor liability may attach to persons who are legally incapable of committing an object offense. "[I]t was held long ago that even though 'a defendant was incompetent to commit the offense as principal by reason of not being of a particular age, sex, condition, or class, he may, nevertheless, be punished as procurer or abettor.' " *United States v. Lester*, 363 F.2d 68, 72 (6th Cir.1966) (quoting *United States v. Snyder*, 14 F. 554, 556 (C.C.D.Minn.1882)), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967); *see also, e.g., United States v. Ruffin*, 613 F.2d 408, 413 (2d Cir.1979) ("Where the principal is found guilty of a criminal offense, ... it is undisputed that a person may be convicted as an aider and abettor under 18 U.S.C. § 2(a) even though he may lack the capacity to violate the substantive criminal statute."). Under this general

rule, section 861's limitation to "person[s] at least eighteen years of age" would not exempt minors from aider and abettor liability.

Appellants argue correctly, however, that one recognized exception to the general rule "embraces criminal statutes enacted to protect a certain group of persons thought to be in need of special protection." *United States v. Southard*, 700 F.2d 1, 19 (1st Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *see also United States v. Pino–Perez*, 870 F.2d 1230, 1232 (7th Cir.), *cert. denied*, 493 U.S. 901, 110 S.Ct. 260, 107 L.Ed.2d 209 (1989); *United States v. Hayes*, 827 F.2d 469, 472 (9th Cir.1987). This exception derives from *Gebardi v. United States*, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932), in which the Supreme Court overturned a woman's conviction for having conspired with a man to violate the Mann Act, 18 U.S.C. § 398 (1926) (current version at 18 U.S.C. §§ 2421, 2422 (1988)), which prohibited persons from transporting women in interstate commerce for immoral purposes. The Court explained:

> [W]e perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an affirmative legislative policy to leave her acquiescence unpunished. We think it a necessary implication of that policy that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be, the same participation which the former contemplates as an inseparable incident of all cases in which the woman is a voluntary agent at all, but does not punish, was not automatically to be made punishable under the latter.

*Gebardi*, 287 U.S. at 123, 53 S.Ct. at 38.

Like the Mann Act, section 861 fails to condemn certain activities of members of a protected class: persons under the age of 18 who are "employ[ed], hire[d], use[d], persuade[d], induce[d], entice[d], or coerce[d]" to commit drug violations. Thus, if appellants here were minors when they participated in the drug conspiracy, they arguably should not have been convicted of aiding and abetting a section 861 violation.[16]

At trial, however, appellants did not introduce any evidence that they were under the age of 18 during the relevant time period. Rather, they moved for judgments of acquittal on the ground that the government had failed to meet its burden of proving their majority status. On appeal, they continue to assert that the government bore the burden of proof. We conclude, however, that in order to invoke the protected class exception set out in *Gebardi*, appellants had the burden of coming forward with some evidence of their membership in such a class.

This court has repeatedly held that aiding and abetting consists of the four elements mentioned above. *See United States v. Poston*, 902 F.2d 90, 93 (D.C.Cir. 1990); *United States v. Garrett*, 720 F.2d 705, 713 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1037, 104 S.Ct. 1311, 79 L.Ed.2d 708 (1984); *United States v. Raper*, 676 F.2d at 849. None of these elements requires that the aider and abettor be able to commit the object offense as a principal. Thus, the government typically can convict a defendant of any offense on an aiding and abetting theory without introducing proof of the defendant's legal capacity to commit that offense.

Appellants nonetheless invite us to carve out a small category of "protected class" cases for which the government cannot establish aider and abettor liability without

---

**16.** In *United States v. Spitler*, 800 F.2d 1267 (4th Cir.1986), the Fourth Circuit explained that "[w]hen an individual protected by ... legislation exhibits conduct more active than mere acquiescence, ... he or she may depart the realm of a victim and may unquestionably be subject to conviction for aiding and abetting and conspiracy." *Id.* at 1276; *see also Gebardi*, 287 U.S. at 119, 53 S.Ct. at 36 ("In applying this criminal statute we cannot infer that the *mere acquiescence* of the woman transported was intended to be condemned by the general language punishing those who aid and assist the transporter...." (emphasis added)). Since we reject appellants' contentions on other grounds, we need not decide whether their conduct was "more active than mere acquiescence" for *Gebardi* purposes.

first proving a defendant's legal capacity to commit the object offense. We decline the invitation. Analogous legal incapacity defenses, such as insanity and intoxication, ordinarily must be raised by defendants. *See* 1 C. TORCIA, WHARTON'S CRIMINAL EVIDENCE §§ 23 & 26 (14th ed. 1985). Proof is allocated in this manner "primarily because the facts in support of [these defenses] would be peculiarly within the knowledge of the accused." *Id.* § 19. Moreover, the prosecutor is spared the burden of anticipating, and then refuting in the first instance, every conceivable defense that the defendant might later advance. *See id.* We think that these policies apply equally to the protected class defense asserted here. *See* 1 P. HERRICK, UNDERHILL'S CRIMINAL EVIDENCE § 53 (6th ed. 1973) ("[I]f a fact is peculiarly within the knowledge of the accused, as his own age when he pleads nonage as a defense, ... the burden of proof generally rests on him."). Although we do not decide whether appellants bore the ultimate burden of persuading the jury that they were minors during the drug conspiracy, we hold that they did have the initial burden at least of producing some evidence of their juvenile status.

In denying appellants' motions for judgments of acquittal, the district court decided that the government had introduced sufficient evidence to support a *prima facie* case that each defendant had aided and abetted a violation of section 861. We agree. The court's ruling, however, did not preclude appellants from seeking to introduce proof of their ages into the record in order to establish a protected class defense. They failed properly to raise that defense in the district court, and the district court was under no obligation to raise it for them. Even here, appellants make no claim that they might prevail on the defense if given another opportunity to do so. Accordingly, we affirm their convictions under section 861.

VII.

We turn now to the sentencing issues raised by this case. Gary Wyche challenges four aspects of his final sentence under the Sentencing Guidelines.[17] He argues that the district court (1) miscalculated the base offense level for his drug conspiracy conviction, (2) enhanced that level based on an impermissible finding that he had physically restrained a victim, (3) enhanced further based on a clearly erroneous finding that he had acted as a manager in the conspiracy, and (4) double counted his possession of a gun during the conspiracy. Finding merit in two of Wyche's challenges, we vacate his sentence and remand for resentencing.

■■■ Wyche first argues that the district court set the wrong base offense level for his drug conspiracy conviction. We agree that the court might have erred. Section 2D1.4, the provision applicable to drug conspiracy convictions under 21 U.S.C. § 846, states that "[i]f a defendant is convicted of participating in an incomplete conspiracy ... to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed." U.S.S.G. § 2D1.4(a). The object of the conspiracy here, distribution of and possession with intent to distribute drugs, is governed by section 2D1.1. Pursuant to that guideline, the district court fixed Wyche's base offense level at 36 "[o]n the basis of the distribution of crack alone, over 500 grams." *See id.* § 2D1.1(c)(4). In its sentencing memorandum, the court explained that Wyche had not "challenge[d] the presentence report's finding that he distributed and belonged to a conspiracy that distributed more than 500 grams of crack cocaine." But the presentence report had found that 500 grams of crack was *twice* the amount of drugs involved in the conspiracy.[18] Because we do

***

17. Because the district court sentenced appellants before November 1989, we rely only on guidelines in effect before the November 1989 amendments. *See* 18 U.S.C. § 3553(a)(4).

18. The presentence report calculated twice the amount of drugs in order to set the base offense level for Wyche's violation of 21 U.S.C. § 845b (currently section 861). *See* U.S.S.G. § 2D1.2(a)(2) (commanding the district court, in determining the base offense level applicable

not know the extent to which the district court relied on the presentence report to make its ultimate sentencing findings, we must remand for verification of the correct drug amount.

■■■ Wyche next argues that the district court improperly enhanced his base offense level under section 3A1.3 of the Guidelines. That provision permits a two-level increase "[i]f the victim of a crime was physically restrained in the course of the offense." *Id.* § 3A1.3. The court applied this guideline to Wyche because he had participated in the drug conspiracy, members of which had restrained Anthony Chung. Wyche argues that the court's finding was improper because it was unsupported by the record and contrary to the jury's verdict, which had acquitted him of assaulting Chung.

Application note 1 to section 2D1.4, the guideline applicable to Wyche's conspiracy conviction, explains that "the sentence should be imposed only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to the defendant or was reasonably foreseeable." *Id.* § 2D1.4 application note 1. The district court's two-point adjustment was proper as long as the government proved by a preponderance of evidence that the restraint of Chung was in furtherance of the conspiracy and reasonably forseeable to Wyche. *See United States v. Burke,* 888 F.2d 862, 869 (D.C.Cir. 1989). We review only for clear error the district court's finding that the government met its burden. *See* 18 U.S.C. § 3742(e); *United States v. Bianco,* 922 F.2d 910, 913 (1st Cir.1991).

At trial, Chung testified that on September 2, 1988, members of the drug conspiracy had beaten him repeatedly because he owed them money. After the beatings, they took him to an apartment in Maryland and detained him there for seven days, while the swelling on his face healed. Chung testified that he did not leave the apartment because his captors did not let him.

Wyche does not disclaim membership in the drug conspiracy at the time of Chung's restraint. Nor does he point to any evidence that Chung's confinement was outside the scope of the conspiracy or unforeseeable to Wyche. Instead, Wyche argues that because the jury acquitted him of participating in the September 2 assault on Chung, the district court could not lawfully enhance his sentence for restraining Chung. But the assault to which Wyche refers preceded the restraint for which his sentence was enhanced. As the district court noted in its sentencing memorandum: "[w]hile [Wyche] was acquitted of beating Chung, the jury was not asked to, and did not address whether he restrained Chung." We therefore need not decide whether a sentencing court may enhance a sentence based on conduct for which a defendant has been acquitted.[19] Because the district court's findings with respect to the Chung restraint were not clearly erroneous, we affirm the two-point enhancement under section 3A1.3.

■■■ Wyche also challenges the district court's decision to enhance his base offense level by three points for his role as a "man-

to certain § 845b violations, to apply the "[l]evel from 2D1.1, corresponding to double the drug amount involved").

**19.** We note, however, that nine circuits allow sentencing courts to make enhancements or departures on the basis of acquitted conduct. *See United States v. Averi,* 922 F.2d 765, 765–66 (11th Cir.1991); *United States v. Fonner,* 920 F.2d 1330, 1332–33 (7th Cir.1990); *United States v. Duncan,* 918 F.2d 647, 652 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991); *United States v. Rodriguez-Gonzalez,* 899 F.2d 177, 180–81 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); *United States v. Dawn,* 897 F.2d 1444,

1449–50 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 389, 112 L.Ed.2d 400 (1990); *United States v. Mocciola,* 891 F.2d 13, 16–17 (1st Cir. 1989); *United States v. Isom,* 886 F.2d 736, 738–39 (4th Cir.1989); *United States v. Juarez-Ortega,* 866 F.2d 747, 748–49 (5th Cir.1989); *United States v. Ryan,* 866 F.2d 604, 608–09 (3d Cir. 1989); *cf. United States v. Campbell,* 684 F.2d 141, 154 (D.C.Cir.1982) (pre-Guidelines case sustaining the sentencing court's reevaluation of facts underlying acquittal because "there [was] a persuasive basis for the conclusions reached by the ... court"). *But see United States v. Brady,* 928 F.2d 844, 850–52 (9th Cir.1991).

ager" or "supervisor" in a drug conspiracy that "involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Because "the district court [was] in the best position to assess the defendant's relative culpability vis-a-vis other participants in the offense," we review this decision deferentially. *United States v. Williams*, 891 F.2d 921, 926 (D.C.Cir.1989).

In its sentencing memorandum, the district court found that Wyche "supervised Jack Lipford as well as unindicted coconspirators and juveniles, including 'Ed', 'TJ', 'Boo' and Rodriguez Sneed" and that he "controlled the cocaine flow to several workers and collected money from drug sales." At the sentencing hearing, the court further stated that Wyche

> was a major participant in all the activities of the Palmer conspiracy, including the distribution of 100 to 200 kilos of crack in the District of Columbia. I believe he admitted to the probation officer that he paid salesmen as much as 1,000 to 2,000 a week, and that he himself made as much as $5,000 a day from the drug trade.

As none of these findings is clearly erroneous, we affirm the court's three-point enhancement under section 3B1.1(b).

■ Finally, Wyche contends that the district court improperly enhanced his base offense level by two points for his possession of a gun during the drug conspiracy. Wyche was convicted of three substantive offenses involving guns: intentionally assaulting a person with a dangerous weapon in violation of D.C.Code Ann. § 22–502, using or carrying a firearm during the drug conspiracy in violation of 18 U.S.C. § 924(c), and possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g). In sentencing Wyche, the court imposed a three- to nine-year concurrent sentence for the D.C.Code conviction, a five-year concurrent sentence for the section 922(g) conviction, and a five-year consecutive sentence for the section 924(c) conviction. The court also added two points to Wyche's base offense level on the underlying drug conspiracy. Wyche argues that

because the district court imposed a five-year consecutive sentence for his section 924(c) conviction, it could not also impose the two-point enhancement on the underlying drug conspiracy. We agree.

The district court assessed the two-point enhancement pursuant to U.S.S.G. § 2D1.1. Section 2D1.1(a) establishes the base offense levels for drug trafficking offenses, including the drug conspiracy for which Wyche was convicted (*see id.* § 2D1.4). Section 2D1.1(b)(1) identifies gun possession as a specific offense characteristic of the drug offenses covered by section 2D1.1(a). It commands the sentencing court to add two points to the base level computed in subsection (a) "[i]f a firearm or other dangerous weapon was possessed during commission of the offense." *Id.* § 2D1.1(b)(1). Since Wyche was convicted under 18 U.S.C. § 924(c) of using or carrying a firearm during the drug conspiracy, he must also have possessed a firearm during that conspiracy. *See United States v. Long*, 905 F.2d 1572, 1576–77 (D.C.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990). He therefore must have possessed a firearm "during the commission of the [underlying] offense," within the meaning of section 2D1.1(b).

Wyche was sentenced for his section 924(c) conviction under section 2K2.4 of the Guidelines. That provision adopts the five-year minimum sentence required by statute. *See* U.S.S.G. § 2K2.4. The district court properly sentenced Wyche to this five-year consecutive term. "To avoid double counting," however, application note 2 to section 2K2.4 provides that "[w]here a sentence under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of a firearm ... is not to be applied in respect to the guideline for the underlying offense." *Id.* § 2K2.4 application note 2. Here, the sentence for the section 924(c) conviction was imposed in conjunction with the sentence for the underlying drug conspiracy conviction. Under the application note's plain language, therefore, the imposition of a five-year sentence for Wyche's use of a firearm during the conspiracy pre-

cluded the district court from counting Wyche's possession of the firearm as a specific offense characteristic for the same conspiracy.

The district court apparently thought that it could base the two-level enhancement on Wyche's conviction under 18 U.S.C. § 922(g). Convictions under section 922(g) are sentenced under U.S.S.G. § 2K2.1, however. Since section 922(g) violations involve possession of a weapon by definition, section 2K2.1 factors that possession into the base offense level and provides for no further enhancement on that basis. Of all the offenses for which Wyche was convicted, the only one for which the Guidelines identify gun possession as a specific offense characteristic was the drug conspiracy charge, on which the section 924(c) conviction was predicated and for which application note 2 is controlling.[20]

Since we are remanding Wyche's sentence, we note that we have had some difficulty understanding how the district court applied the Guidelines. Section 1B1.1 explains that all specific offense characteristics and most adjustments (including all of the ones we have considered) are applied count-by-count, base offense level by base offense level—*before* the offense levels applicable to each count are grouped and aggregated into a single overall offense level. As far as we can tell, however, the district court grouped the various counts prior to determining the applicable specific offense characteristics and adjustments. We are therefore unable to determine which enhancements the court intended to apply to which counts of conviction and, accordingly, how our rulings on Wyche's various challenges will affect his final sentence.

## VIII.

■■ All appellants attack the district court's choice of the base offense level. The district court concluded that the base offense level for all of the defendants was determined by the distribution of narcotics count and not the CCE count.[21] They claim that the government prosecuted the case on the theory that the principal offense committed consisted of the operation of the CCE and not of the operation of the drug distribution conspiracy that provided the predicate for the CCE violation. The identical argument in a similar case was described as "ignor[ing] common sense and the law of CCE and conspiracy and distort[ing] the manner in which the government prosecuted this case." *United States v. Edmond*, 746 F.Supp. 200, 204 (D.D.C. 1990).

As an initial matter, we are puzzled by the insistence of four of the appellants that they should be sentenced for a crime for which they have not been convicted—only Palmer was charged and convicted under the CCE statute, and only he would be entitled to claim that the base offense was the CCE. Appellants' argument, however, would be mistaken even on the assumption that using conspiracy to distribute as a base offense could negatively affect Palmer. The Sentencing Guidelines do not entitle the defendant (or the government) to pick and choose the most appropriate base offense level. Instead, when a defendant's drug-related convictions are grouped together for purposes of sentencing pursuant to U.S.S.G. § 3D1.2, the Guidelines specifically require the use of the highest offense level (after all of the adjustments are made) among those available. *See* U.S.S.G. § 3D1.3. Thus, Palmer's complaint is inherently misguided—any error in the choice of the base offense level when convictions are grouped pursuant to section 3D1.2 always benefits the defendant, because the Guidelines require the imposition of the highest available offense level.

\* \* \* \* \* \*

20. We do not address Wyche's alternative argument that the court could not have assessed the two-point enhancement because the section 924(c) and section 922(g) convictions applied to the same conduct.

21. The Guidelines require the sentencing court to apply to the conspiracy conviction the same base offense level assigned to the offense that is the predicate crime of the conspiracy. *See* U.S.S.G. § 2X1.1(a).

We have fully considered all other issues and arguments advanced by appellants and are satisfied that none has sufficient merit to justify alteration of the district court's judgments. Accordingly, we affirm all of the challenged convictions and sentences with the exception of Harris' and Smith's convictions under 26 U.S.C. § 5861(d), which we reverse, and Wyche's sentence, which we vacate and remand for resentencing.